Jerome KAPLAN, Plaintiff,

v.

Oscar S. WYATT, Jr., WJS Shipping Associates, Inc., a Delaware corporation, and the Coastal Corporation, a Delaware corporation, Defendants.

Court of Chancery of Delaware,
New Castle County.

Submitted: July 6, 1984.
Decided: Nov. 5, 1984.

502

Irving Morris, of Morris & Rosenthal, Wilmington, and Melvyn Weiss, of Milberg, Weiss, Bershad, Specthrie & Lerach, New York City, for plaintiff.

Louis J. Finger, of Richards, Layton & Finger, Wilmington, and Michael Lesch, of Shea & Gould, New York City, for defendant Oscar S. Wyatt, Jr.

A. Gilchrist Sparks, of Morris, Nichols, Arsht & Tunnell, Wilmington, for defendant WJS Shipping Associates, Inc.

Roderick R. McKelvie, of Ashby, McKelvie & Geddes, Wilmington, and Robert E. Walls, Houston, Tex., for defendant The Coastal Corp.

Henry N. Herndon, Jr., of Morris, James, Hitchens & Williams, Wilmington, and Brown, Wood, Ivey, Mitchell & Petty, New York, N.Y., for Special Litigation Committee of The Coastal Corp.

BROWN, Chancellor.

On February 4, 1981 Jerome Kaplan, a shareholder of the defendant, The Coastal Corporation (hereafter "Coastal"), filed this derivative action on behalf of Coastal. Named as defendants in addition to the corporation itself are Oscar S. Wyatt, Jr. and WJS Shipping Associates, Inc. (hereafter "WJS"). Both Coastal and WJS are Delaware corporations. The defendant Wyatt is chairman of the board and chief executive officer of Coastal. The primary business of Coastal, a large publicly held company, is trading in oil and petroleum products.

Kaplan's complaint, as subsequently amended, is directed against the defendant Wyatt. Specifically, it alleges that Wyatt engaged in three seperate areas of wrongful conduct, namely, (1) that he "interpositioned" himself in the "Rotterdam spot market" and thereby participated in and profited personally from oil trading activities which rightfully belonged to Coastal; (2) that he wrongfully caused Coastal to enter on unfair terms into a sale and lease-back transaction for a transoceanic tanker with WJS, a corporation in which his son, Carl Wyatt, is alleged to have had a substantial interest; and (3) that by various means he exacted excessive compensation from Coastal, including excessive amounts for the lease of his personal airplane to the corporation. The amended complaint does not make reference to any specific transactions or oil trading activities in which Mr. Wyatt is alleged to have participated and profited personally at the expense of Coastal, and to my knowledge no specific indication as to any such transactions has yet appeared in the record of the case.

The case has nonetheless been filled with activity. This is directly attributable to the fact that on May 13, 1981 the Delaware Supreme Court rendered its decision in *Zapata Corp. v. Maldonado*, Del.Supr., 430 A.2d 779 (1981). In that case our Supreme Court gave its blessing to the creation of a new creature, namely, the Special Litigation Committee. In the context of our corporate law a Special Litigation Committee is a committee of one or more directors appointed by the board of directors of a Delaware corporation as a whole to evaluate the desirability of maintaining a derivative suit which has been brought on the corporation's behalf by a shareholder without a demand having first been made on the board to take such action. Such a committee, once appointed, is empowered thereafter to seek a dismissal of the derivative action should it deem the situation to warrant it.

In this case, Coastal proceeded to appoint a Special Litigation Committee to investigate and make a recommendation as to Kaplan's complaint and its allegations of injury to the corporation. The Special Litigation Committee has since made its investigation and has submitted a lengthy report in which it recommends that it is in the best interests of the corporation to have the suit dismissed. Pursuant to this report, and under the guidelines established by *Zapata Corp. v. Maldonado, supra,* the Special Litigation Committee has gone further and has caused a motion to be filed on behalf of the defendant Coastal seeking dismissal of Kaplan's derivative action. This represents the Court's decision on that motion.

### I

While it is generally undesirable to unduly lengthen a decision on the merits of an application with an extensive examination of the law that governs the determination to be made, I find it judicially appropriate to do so in this case. This is because, to my knowledge, this is the first case in this Court to reach the point of decision on a motion generated by a Special Litigation Committee to dismiss a derivative suit under the authority of *Zapata.* Thus, it seems only fair that I should set forth the basis on which I approach the decision to be made which, in turn, derives solely from my subjective interpretation of *Zapata.* In so doing, I make no effort to deal with the policy or legal rationale of the Special Litigation Committee approach. That has been ably done by our Supreme Court in *Zapata* itself and by other courts as well. See, for example, *Joy v. North,* 692 F.2d 880 (2d Cir.1982), *cert. denied,* 460 U.S. 1051, 103 S.Ct. 1498, 75 L.Ed.2d 930 (1983); *Auerbach v. Bennett,* 47 N.Y.2d 619, 419 N.Y.S.2d 920, 393 N.E.2d 994 (1979). I deal only with the *mechanics* of addressing a motion to dismiss initiated by a Special Litgation Committee as they may be gleaned from a reading of *Zapata.*

### II

The *Zapata* decision establishes a unique procedure to be followed by the Court of Chancery in cases in which a motion to dismiss is made at the behest of a Special Litigation Committee. The guidelines for this new procedure are found within the following language of the Supreme Court in *Zapata Corp. v. Maldonado, supra,* at 430 A.2d 788–789:

"After an objective and thorough investigation of a derivative suit, an independent committee may cause its corporation to file a pretrial motion to dismiss in the Court of Chancery. The basis of the motion is the best interests of the corporation, as determined by the committee. The motion should include a thorough written record of the investigation and its findings and recommendations. Under appropriate Court supervision, akin to proceedings on summary judgment, each side should have an opportunity to make a record on the motion. As to the limited issues presented by the motion noted below, the moving party should be prepared to meet the normal burden under Rule 56 that there is no genuine issue as to any material fact and that the moving party is entitled to dismiss as a matter of law. The Court should apply a two-step test to the motion.

"First, the Court should inquire into the independence and good faith of the committee and the bases supporting its conclusions. Limited discovery may be ordered to facilitate such inquiries. The corporation should have the burden of proving independence, good faith and a reasonable investigation, rather than presuming independence, good faith and reasonableness. If the Court determines either that the committee is not independent or has not shown reasonable bases for its conclusions, or, if the Court is not satisfied for other reasons relating to the process, including but not limited to the good faith of the committee, the Court shall deny the corporation's motion. If,

however, the Court is satisfied under Rule 56 standards that the committee was independent and showed reasonable bases for good faith findings and recommendations, the Court may proceed, in its discretion, to the next step.

"The second step provides, we believe, the essential key in striking the balance between legitimate corporate claims as expressed in a derivative stockholder suit and a corporation's best interests as expressed by an independent investigating committee. The Court should determine, applying its own independent business judgment, whether the motion should be granted. This means, of course, that instances could arise where a committee can establish its independence and sound bases for its good faith decisions and still have the corporation's motion denied. The second step is intended to thwart instances where corporate actions meet the criteria of step one, but the result does not appear to satisfy its spirit, or where corporate actions would simply prematurely terminate a stockholder grievance deserving of further consideration in the corporation's interest. The Court of Chancery of course must carefully consider and weigh how compelling the corporate interest in dismissal is when faced with a non-frivolous lawsuit. The Court of Chancery should, when appropriate, give special consideration to matters of law and public policy in addition to the corporation's best interests.

"If the Court's independent business judgment is satisfied, the Court may proceed to grant the motion, subject, of course, to any equitable terms or conditions the Court finds necessary or desirable."

By taking these general guidelines and reducing them to the step-by-step procedure which flows either directly or by necessary implication from the Supreme Court's reasoning and directive, it would appear that the following analysis is warranted for the purpose of this proceeding.

■ To begin with, where a derivative action is brought pursuant to Rule 23.1 without a demand first being made upon the board of directors because of reasons set forth in the complaint, the board, if it so desires, may appoint an independent committee to investigate the allegations of wrongdoing against the corporation as contained in the complaint.

■ After a thorough and objective investigation, the independent committee appointed by the board of directors—otherwise referred to herein as the Special Litigation Committee—may cause the corporation to file a pretrial motion to dismiss a derivative suit brought on the corporation's behalf.

The basis for the motion is the best interests of the corporation, as determined by the independent Special Litigation Committee.

The motion must be supported by a thorough written record. The written record must speak to three separate elements, namely, (1) the investigation made by the Committee; (2) the findings of the Committee; and (3) the recommendation of the Committee.

■ Pursuant to the language of the Supreme Court found at 430 A.2d 787–788 it appears that the motion itself is neither a motion to dismiss under Rule 12(b), nor is it a motion for summary judgment pursuant to Rule 56. This is because it is not addressed to the adequacy of the cause of action alleged in the complaint, on the one hand, nor, on the other, is it addressed to the merits of the issues joined by the pleadings. Rather, the motion is a hybrid one, derived by analogy to a motion to dismiss a derivative suit based upon a voluntary settlement reached between the parties and to

a motion brought pursuant to Rule 41(a)(2) whereby a plaintiff unilaterally seeks a voluntary dismissal of the complaint subsequent to the filing of an answer by the defendant. As such, it is addressed necessarily to the reasonableness of dismissing the complaint prior to trial without any concession of liability on the part of the defendants and without adjudicating the merits of the cause of action itself.

█ Despite the fact, however, that the motion is not strictly one for summary judgment pursuant to Rule 56, *Zapata* says that it is to be handled procedurally in a manner akin to proceedings on summary judgment in two separate respects:

(1) Each side (and as to the motion this means the plaintiff on the one hand and the corporation through its representative, the Special Litigation Committee—and not the other defendants—on the other) shall have an opportunity to make a record on the motion. (Presumably, this means by supplementing the pleadings with affidavits and/or verified documents, and, as hereafter noted, by such other discovery as may be permitted by the Court).

(2) As to the limited issues presented by the motion, the corporation (through the Committee), as the moving party, has the normal burden imposed on a moving party under a Rule 56 motion of demonstrating that there is no genuine issue as to any material fact and that the corporation is entitled to dismiss the complaint as a matter of law.

█ The "opportunity" to make a record on the motion also includes the potential for limited discovery. The only purpose of such limited discovery in this setting, however, is to assist the Court in its inquiries into the good faith and independence of the Committee as well as its inquiry into the bases supporting the conclusions of the Committee. This is indicated by the statement at 430 A.2d 788 that "[l]imited discovery *may be ordered* to facilitate such inquiries." Two things derive from this:

(1) The discovery permitted for the purpose of making a record on the motion does not amount to discovery by either the plaintiff or by the Special Litigation Committee as a matter of right. Rather, such discovery may be had only by order of the Court.

(2) Consequently, the type and extent of any discovery in a particular case is a matter left to the discretion of the Court and may be undertaken only if first authorized by the Court.

█ The issues to be considered by the Court on the motion are also limited and they are to be addressed by the Court in a two-step analysis. In order, the issues for determination are:

(1) The independence and good faith of the Committee in making its investigation plus the reasonableness of the bases relied upon by the Committee in concluding and recommending that the cause of action on behalf of the corporation be dismissed.

(2) The interests of the corporation in having the litigation continued by one of its shareholders on its behalf despite the fact that the Committee has proven to the satisfaction of the Court that it was independent and that its investigation and recommendation was made in good faith supported by a reasonable basis in fact and law.

█ With regard to the first step, the burden is on the Corporation to prove the independence of the Special Litigation Committee and to prove also that it conducted a reasonable investigation of the matters alleged in the complaint in good faith. For purposes of the motion the Committee is entitled to no presumption of independence, good faith and reasonableness.

**508**

If, after the motion has been argued or submitted for decision, the Court

(1) is satisfied on the record presented by the motion that there is a genuine issue as to one or more material facts, *or*

(2) determines on the undisputed material facts that the Committee is not independent, *or*

(3) determines on the undisputed material facts that the Committee has not shown reasonable bases for its conclusions, *or*

(4) is not satisfied on the undisputed material facts that the Committee has acted in good faith, *or*

(5) is satisfied for other reasons relating to the investigative process engaged in by the Committee that it has failed to carry its burden of proving its independence, good faith and a reasonable basis for its recommendation,

then the Court shall deny the motion for such reason and need go no farther, the result being that the shareholder plaintiff may resume immediate control of the litigation with a view toward prosecuting it to a conclusion regardless of the position taken by the special investigating committee appointed by the corporation's board of directors.

If, however, after the motion has been argued or submitted for decision, the Court

(1) is satisfied that there is no genuine issue as to any material fact presented by the record made on the motion, *and*

(2) is further satisfied on the undisputed facts of record pertaining to the motion that the Committee is independent of the corporation's board of directors, that it has made a reasonable investigation and has shown reasonable bases for its findings and recommendations, and that they were made in good faith,

then the Court may do either of two things, namely, (1) grant the motion, order a dismissal of the suit and end the litigation, or (2) *in its discretion,* proceed to the second-step analysis before rendering a decision on the motion.

If the Court, in its discretion, elects to proceed to the second step then its function is to exercise its own independent business judgment in striking a balance between "legitimate corporate claims" as expressed in the derivative shareholder suit and the corporation's best interest as ascertained by the Special Litigation Committee.

In proceeding to this discretionary, second-step analysis, it is important to note two things. Again, as a precondition, the Court must be satisfied from the record presented by the motion that the Committee was, in fact independent, that it acted in good faith in making its investigation, that it conducted a reasonable investigation under the circumstances, and that it had a reasonable basis for making its recommendation that the derivative action be dismissed. Second, the Court must proceed on the premise that the cause of action alleged on behalf of the corporation in the derivative complaint is a "legitimate" one, i.e., presumably one that states on its face a legally cognizable wrong against the corporation which, once the proof is in, may well result in a judgment in favor of the corporation.

It is necessary to make this assumption of a legitimate corporate claim at this second step for two reasons. First, in deciding whether or not to permit the suit to proceed, the Court is not passing on the evidentiary merits of the plaintiff's allegations. That will only come later in the event that the Committee's recommendation is rejected. (This lack of emphasis on the merits of the plaintiff's complaint *per se* also applies to the first-step analysis where the focus is limited to the independence and good faith of the Committee and the reasonableness of its investigation and conclusions.) Second, the rationale to be applied at the second step is that of public policy and the spirit of the law as well as, from a pure business standpoint, the over-

riding best interests of the corporation and its shareholders when weighing a good faith recommendation of dismissal made by the independent Committee against "a non-frivolous lawsuit." Thus, for the purpose of this second-step analysis, Court must presume, without deciding, that the cause of action alleged has the potential for being a good one.

The discretionary second-step analysis thus contemplates the balancing of two potentially off-setting premises, namely, the good faith and reasonably supported view of an independent Committee, as factually established, that it would be in the best interests of the corporation and its shareholders to dismiss the derivative action without asking the Court to address the merits of the matter, versus a theoretically valid cause of action which may well result in a recovery on behalf of the corporation if it is permitted to go to trial or final disposition on the merits.

In applying its own independent business judgment to this second-step analysis, should the Court choose in its discretion to make one, it is necessary that the Court, in addition to considering matters of law and public policy, consider also such ethical, commercial, promotional, public relations, employee relations and fiscal factors as may be involved in a given situation. (See the discussion of the Supreme Court at 430 A.2d 788).

If the Court is satisfied as a result of its own independent, second-step analysis that the derivative suit should go forward despite the good faith and reasonably supported recommendation by the Special Litigation Committee that it be dismissed, then, again, the motion to dismiss initiated on behalf of the corporation by the independent Committee will be denied and immediate active control of the suit will be returned to the plaintiff shareholder.

Finally, if the Court is itself satisfied after this second-step analysis that it is in the best interests of the corporation to dismiss the suit, as recommended by the Special Litigation Committee, it may grant the motion and do so, subject to such equitable terms or conditions as the Court may find to be appropriate as a result of its second-step analysis.

As best I can determine, the foregoing represents the procedural teaching of *Zapata*.

### III

If the foregoing analysis of *Zapata* seems like a legal mouthful, it is because it is. Yet I fail to see how the Special Litigation Committee procedure can be taken lightly or stated any less explicitly given that which is at stake. For it must be kept in mind that the entire procedure is designed to provide a means, if warranted, to throw a derivative plaintiff out of Court before he has an opportunity to engage in any discovery whatever in support of the merits of his cause of action purportedly brought on the corporation's behalf. In fact, the *Zapata* procedure takes the case away from the plaintiff, turns his allegations over to special agents appointed on behalf of the corporation for the purpose of making an informal, internal investigation of his charges, and places the plaintiff on the defensive once a motion to dismiss is filed by the Special Litigation Committee, leaving him to snipe away at the bona fides of the Committee and its extra-judicial investigation in a last-ditch effort to salvage a right to present the case on the corporation's behalf as he sees it. The procedure also asks the Court to consider dismissing the case prior to the time that the facts pertaining to the plaintiff's allegations are developed in an adversarial context unlike the procedure that has existed heretofore.

As to whether this new departure in derivative litigation is good or bad I offer no judgment. Certainly, it has its justification in legal theory as is ably expressed in *Zapata*. However, it is fraught with practical complications at the trial court level. It certainly does not speed up the course of derivative litigation and, based upon what I have seen so far, it is doubtful that it reduces the expense or inconvenience of

derivative litigation to the corporation. A brief digression in support of this first impression observation does not seem to be out of order.

██ Experience since *Zapata*, including the activities in this case, indicates that procedurally the Special Litigation Committee approach has added at least three new hearings to a derivative suit brought by a shareholder in the absence of demand on the board of directors. The first thing that takes place is that the Special Litigation Committee, upon being appointed, promptly moves on the corporation's behalf for a stay of all discovery by the plaintiff pending the investigation and report of the Committee. It is a foregone conclusion that such a stay must be granted. Otherwise, the entire rationale of *Zapata*, i.e., the inherent right of the board of directors to control and look to the well-being of the corporation in the first instance, collapses.

The practical problem comes, however, with the length of the stay. This, in turn, must be measured against the complexities of the plaintiff's allegations since the nature of the wrongs alleged will naturally have a bearing on the extent of the investigation to be made. The Committee generally will seek a stay of many months so that it will have ample time to be thorough in its task. (*Zapata* specifically requires that the investigation be thorough.) The plaintiff naturally thinks that a far shorter time, say 60 to 90 days, will be adequate. Thus the conflicting contentions of the parties, and their reasons, must be heard and the Court must issue a ruling setting a timetable for the extra-judicial investigation to be performed by the Committee.

Secondly, it would seem that there always exists at least a reasonable likelihood that the Committee will come back with a report recommending that the suit be dismissed. Such is the situation here. In that event, the plaintiff then moves (as he did here) to take discovery of the Special Litigation Committee so as to examine into its independence and good faith, the reasonableness of its investigation given the circumstances, and the justification for its conclusions and recommendations. As noted earlier, the Supreme Court has indicated in *Zapata* that discovery by the plaintiff at this stage of the procedure is "limited discovery" such as may be ordered by the trial court to facilitate the inquiries of the trial court into the independence and good faith of the Committee and the reasonableness of its investigation and conclusions. Thus, discovery in this sense seems to be intended more as an aid to the Court than it is as a preparation tool for the parties.

Moreover, since such discovery is not afforded to the plaintiff as a matter of right but only to such extent as the Court deems necessary for the purpose of facilitating its inquiries, and since each case will naturally vary according to its facts, it necessarily follows that the Court is first required to read and digest the report of the Special Litigation Committee before determining the extent of the discovery to be permitted. This discovery exercise under the *Zapata* procedure has its drawbacks.

To begin with, the developing rule of thumb in this jurisdiction would appear to be that a report by a Special Litigation Committee recommending dismissal of a derivative suit must be at least 150 pages in length, exclusive of appendicies and attachments. Presumably, length is thought to be supportive of thoroughness and good faith on the part of the Committee. Correspondingly, it is apparently feared that a shorter report might be thought to be indicative of the converse. In any event, it then becomes the task of the Court to review the report for the purpose of ruling on the plaintiff's pending discovery request, keeping in mind that at the same time the Court is laying a foundation for the possible exercise of its business judgment in the event that it should feel the need, in its discretion, to go to the second step of the *Zapata* test in ultimately passing on the motion to dismiss.

Also as a practical matter, experience shows (as it did here) that the plaintiff will attempt to seek all the discovery that he

could possibly hope to obtain if he were seeking discovery on the merits of the allegations of the complaint. And why not? He certainly has nothing to lose by asking. And he has arguable justification. How can he test fully the reasonableness and good faith of the Committee's investigation unless he looks at each and every document reviewed by the Committee and unless he takes his own deposition of each person interviewed by the Committee so as to compare the Committee's findings with his own? And why should he not have access even to documents that were not examined by the Committee? Certainly, if he can turn up something of substance that was ignored by the Committee, it will support his argument that the recommendation of the Committee should not be honored. Of course, such all-encompassing discovery is not within the spirit of *Zapata* since its mandate contemplates only such discovery as fits the occasion in the view of the Court.

In any event, the "limited discovery" request of the plaintiff takes on particular significance since that which he gets— which in all probability will be something less than all he wants—will constitute the framework on which he must defend the motion initiated by the Special Litigation to have his derivative suit dismissed. Again, after assimilating a lengthy factual report, the Court must hear the parties on this issue and make the appropriate ruling.

Finally, we come to the third hearing, namely, the hearing on the motion sponsored by the Special Litigation Committee to dismiss the suit. By that time, such as is the case here, the shareholder plaintiff has his back to the wall. He is about to be put out of court unless he can establish that there is a genuine dispute of material fact with regard to the investigation and effort of the Committee or unless it can be made to appear from the record on the motion that for some reason the Committee is not an independent one, or that it did not act in good faith, or that there are no reasonable bases to support its conclusions

and recommendation. This naturally causes the plaintiff to pull out all stops and to throw every possible argument imaginable into the controversy, no matter how minor or picayune.

The facts of this case are indicative of the breadth that the scope of such a hearing can take on. In this case the Special Litigation Committee represents that it has interviewed more than 140 persons at various locations throughout the world during the course of its investigation. Many of these persons either are or were corporate officers and personnel of Coastal. The law firm retained by the Special Litigation Committee to assist it in its investigation is said to have expended more than 2,000 hours on the matter so far (this is plaintiff's figure—the Committee says the hours are 5,000 in number) and has received fees and reimbursements in the vicinity of $500,000 for its efforts. The report itself is 156 pages in length, exclusive of attachments.

When the results of such an all-out effort by the Committee are set against an all-out attack by the plaintiff on each and every item on which he can arguably base a claim of lack of independence, bad faith ·or questionable investigatory procedure or conclusion on the part of the Committee, the complexity of the adjudicatory task becomes apparent.

In short, the new *Zapata* procedure, while perhaps laudatory in legal concept, has the pragmatic effect of setting up a form of litigation within litigation. (At this point in this case, we are some three years after the amended complaint was filed, we have had three full-scale, briefed arguments, we have had all of the investigation and activity previously mentioned, and as yet we have not reached the point of any of the normal discovery and motion practice permitted by the Court Rules.) The *Zapata* procedure adds, in effect, a new party to derivative litigation—the Special Litigation Committee—and a new battery of lawyers—counsel for the Committee—with the attendant expense to the corporation. It

sidetracks derivative litigation as we have heretofore known it for approximately two years at a minimum while the Committee goes through its functions and while the plaintiff passively awaits his chances to resist them. And in the process the *Zapata* procedure has imposed substantial additional burdens at the trial court level in each such derivative suit in which it has been employed.

## IV

 Against the backdrop of this procedural analysis I turn to the merits of the pending motion to dismiss the complaint.* I first examine the reasons of the plaintiff as to why he feels the Committee has not carried its burden under *Zapata*.

In this case the Special Litigation Committee was comprised of two persons, namely, J. Howard Marshall, II and Raymond M. Holliday. Mr. Marshall has been a director of Coastal since 1973 and his appointment as an "independent" director was approved at that time by the Securities and Exchange Commission as a result of a consent decree in an unrelated action brought against Coastal by the Securities and Exchange Commission. The corporation, through the Special Litigation Committee, relies heavily on this fact for the proposition that the independence of Marshall is not open to question. Mr. Marshall is a lawyer as well as a director of other corporations. He is well versed by experience in corporate management and affairs. He is independently wealthy in his own right and he denies that he is in anyway beholden to Coastal or to the defendant Oscar S. Wyatt, Jr.

Mr. Holliday was a lawyer and certified public accountant and spent almost his entire business career with Hughes Tool Company, becoming the chairman of its board of directors before his retirement in 1981. Mr. Holliday was named as a director of Coastal a short while before being named as a member of the Special Litigation Committee. There is no challenge by the plaintiff to either the qualifications or the personal independence of Mr. Holliday. Unfortunately, Mr. Holliday died subsequent to the filing of the Special Litigation Committee's report and before the taking of the limited discovery allowed to the plaintiff in this matter.

As a result of Holliday's death, the plaintiff has focused his attack primarily (1) on the claimed independence of Marshall, (2) on what he contends is a lack of good faith and independence on the part of the Committee and its legal counsel in the conduct of the investigation, and (3) on what he contends was an inadequate and unreasonable investigation by the Committee as to certain matters. To illustrate the breadth of the factual issues that can be created at this stage of the *Zapata* procedure, I set forth a litany of the plaintiff's charges hereafter. Those set forth by no means represent all of his contentions, but in my view they are the ones which at least merit mention.

First, with regard to the issue of the independence of Marshall (a lack of which, in plaintiff's view, would fatally taint the independence of the Committee itself) plaintiff points to several factors. To begin with, he notes that Marshall was a director of Coastal at the time of the events complained of and that as a result, even though he is not named as a defendant in this action, it can be argued that he necessarily has a personal interest in seeing that all transactions in which he partici-

---

* On behalf of the corporation, the Special Litigation Committee has alternatively labeled its motion as one for summary judgment. However, summary judgment implies a final judgment on the legal merits of the allegations of the complaint. Since that is not the issue at this stage of the *Zapata* procedure, and since *Zapata* refers to the motion to be brought by the Special Litigation Committee as one to dismiss, the procedure as to which is only "akin" to proceedings on a motion for summary judgment, I deem a motion for summary judgment to be a technically inappropriate procedural vehicle to test the recommendation of a Special Litigation Committee.

pated affirmatively as a director are found to have been proper ones.

In addition, Marshall, along with members of his family, owns a 9% shareholder interest in a company named in Koch Industries. Marshall is also a director of Koch Industries ("Koch"). Koch is said to be the largest private oil company in the United States. Over the years it has done business with Coastal. In 1981, prior to the formation of the Special Litigation Committee, Koch transacted some $100 million in business with Coastal. In 1983, the year in which the Committee's report was filed, Koch and Coastal had business transactions of some $266 million. In the recent past, subsidiaries of Koch and Coastal have sued each other. In 1983, following the submission of the Committee's report, a subsidiary of Coastal sued Koch alleging a violation of Federal racketeering statutes. Koch counterclaimed for $10 million by way of punitive damages. (At his deposition taken by the plaintiff, Marshall indicated that he was unaware of the existence of that litigation and thought that it was probably only a matter of "the lawyers throwing bricks at each other.") Plaintiff argues that this relationship between Koch and Coastal at least gives rise to an inference that Marshall would have had an incentive to placate the defendant Wyatt, the chairman of the board of Coastal, by favoring dismissal of the plaintiff's suit against Wyatt.

Mr. Marshall is also a 50% owner of a company named Petroleum Corporation of Delaware ("Petco") which acts or has acted as a general partner of limited partnerships engaged in oil and gas exploration programs. Coastal has participated as a limited partner in at least three such exploration programs and has contributed millions of dollars in program costs and has received distributions in excess of $2.5 million. Again, plaintiff argues that this past business relationship between Petco and Coastal gives rise to an inference that Marshall would be kindly disposed toward Wyatt, his fellow board member at Coastal, in his investigation efforts as a member of the Special Litigation Committee.

Thirdly, Petco owns 38% of Independent Refining Corporation ("IRC") which, says plaintiff, makes Marshall, as 50% owner of Petco, a 19% owner of IRC. Coastal and IRC have engaged in the past in transactions of crude oil and refined petroleum products. Plaintiff was investigating transactions between Coastal and IRC in connection with this litigation, as the report of the Committee acknowledges. This factor, says plaintiff, is enough to disqualify Marshall from serving on a Special Litigation Committee which is meant by law to be independent.

Finally on this point, one of the matters complained of by the plaintiff in his complaint involves the sale and leaseback after needed repairs of a transoceanic tanker—the "Coastal Kansas"—by Coastal to the defendant WJS. Marshall was one of the Coastal directors who approved this transaction. Moreover, this transaction came about because the "Coastal Kansas" was declared unseaworthy by the maritime authorities only a year after it was purchased by Coastal. The tanker was purchased by Coastal from Koch, of which Marshall is a substantial director and shareholder, at a price four times that for which it was sold to WJS a year later. Under these circumstances, and since the dismissal of the suit as recommended by the Committee would amount to a ratification of the challenged transaction, how, asks the plaintiff, can Marshall be considered to be independent?

In addition, plaintiff argues that for another reason the investigation conducted by the Committee and its counsel cannot be considered to have been independent of Coastal's board and management. This is because a great number, if not all, of the interviews conducted by the Committee were arranged through corporate officers and officials of Coastal and at a great number of those interviews, including those of Coastal employees, members of Coastal's senior in-house legal staff were in attendance.

In this same vein, the basis for the general charge of the plaintiff that the defendant Wyatt was skimming oil trading profits for himself through the so-called "Rotterdam spot market" derives from information allegedly obtained at a meeting held in London between Melvin I. Weiss, one of the plaintiff's attorneys herein, and Joseph Roeber and one Harry Durels. Roeber subsequently provided Weiss with a written memorandum ("the Roeber memorandum") purporting to memorialize the meeting and to support his alleged belief that Wyatt had been engaging in such improper activities.

During the course of its investigation the Special Litigation Committee met with Durels in London to inquire of his knowledge of any such improper trading activities by Wyatt. The Committee's findings were that he had none. Thereafter, plaintiff turned over a copy of the Roeber memorandum to the Committee. However, the Committee itself did not interview Durels again concerning the content of the memorandum. Rather, a senior member of Coastal's in-house legal staff either forwarded or caused a copy of the Roeber memorandum to be forwarded to Durels for his comments. Durels then responded with his own memorandum concerning the content of the Roeber memorandum.

Plaintiff points out with some obvious justification that in the report of the Special Litigation Committee the impression is given that the Committee personally interviewed Durels with respect to the Roeber memorandum when, in fact, it did not. The report does not disclose that Durels's comments on the Roeber memorandum were solicited through the efforts of house counsel for Coastal and not by the Committee or the Committee's counsel.

In view of the attendance by Coastal's staff attorneys at the numerous interviews conducted by the Committee as well as their participation in obtaining the views of Durels on the Roeber memorandum which were relied upon by the Committee in its report—neither of which factors was disclosed in the report itself—the plaintiff suggests that it is obvious that the Committee's investigation was not conducted independent of the board and management of Coastal.

Concerning the good faith of the Committee, plaintiff points to the fact that the New York law firm of Brown, Wood, Ivey, Mitchell & Petty ("Brown, Wood") was retained by the Special Litigation Committee as its counsel and to assist it in making its investigation of the plaintiff's allegations. The problem with this, plaintiff says, is that in an earlier and unrelated class action in the Federal courts in California, the Brown, Wood firm was named as a defendant along with others, and in that action a $50 million recovery was achieved on behalf of the class, with Brown, Wood being responsible for a portion thereof. The successful plaintiff's attorneys in that action were Mr. Weiss and Mr. Morris and their associates, the same attorneys who are representing the plaintiff here. Of all the law firms available in the country to assist it, how can the Committee be said to be acting in good faith, plaintiff asks, by selecting as its counsel a law firm which might conceivably have had a personal axe to grind with the attorneys for the plaintiff here?

Plaintiff further points out, and it is not denied, that although members of the Brown, Wood firm attended the numerous interviews conducted by or on behalf of the Committee, all original notes of such interviews were systematically destroyed by Brown, Wood in favor of a summary of each interview taken and prepared from such notes, thus depriving plaintiff of an opportunity to review the original notes as part of the limited discovery permitted to him under *Zapata*. Plaintiff argues that the deliberate destruction of these original interview notes by the Committee's counsel can only have been intended to prevent plaintiff from ever seeing them, and as such, its constitutes conduct which reeks of bad faith.

Plaintiff also points to the fact that during an early stage of this controversy while

a suit was pending between the parties in New York, and prior to the filing of this suit, one of the staff attorneys for Coastal in attendance at a conference among counsel directed to be held by a Federal judge secretly tape recorded the meeting and thus, without his knowledge or permission, recorded the statements of Mr. Weiss, one of the plaintiff's attorneys. (This conduct was later condemned by this Court when it came to light after the Committee's report had been filed.) Plaintiff points out that despite the fact that Brown, Wood was aware of this surreptitious and improper taping of plaintiff's counsel, the limited discovery granted him has disclosed that Brown, Wood failed to advise the Committee of this circumstance prior to the time that its report was filed and that the Committee utilized the information so obtained in making its report.

As noted previously, the Brown, Wood firm has expended several thousand hours of lawyer time in assisting the Committee in its investigation and has received some $500,000 in fees and expenses for its efforts. By contrast, the two members of the Special Litigation Committee are said to have spent a total of all or part of 35 days on the project for which they received some $17,500 in compensation. In view of this plaintiff suggests that the report is primarily the product of Brown, Wood's efforts and that the taint attributable to the involvement and conduct of Brown, Wood is chargeable to the Committee itself, thus casting doubt as to the good faith of the entire enterprise.

As to another indication of a lack of good faith by the Committee, plaintiff points to its failure to itself interview Mr. Durels personally as to his reaction to the Roeber memorandum while wording its report in such a fashion as to leave the impression that it had done so. Plaintiff also points to statements made by Mr. Marshall during his deposition in which he indicated his sympathy with large oil company chief executives such as Mr. Wyatt in dealing with the maze of Federal regulations governing the operation of the oil industry. He points further to the failure of the Committee to look into the rumor that Mr. Wyatt had obtained Austrian citizenship in case it became necessary to flee this country even though the Committee was aware of such a rumor.

Plaintiff charges that the Committee's lack of good faith is further indicated by its handling of plaintiff's allegations concerning the lease to the corporation of a Westwind aircraft owned personally by Wyatt. Plaintiff alleged in his complaint that Wyatt had received excessive sums for the lease of the aircraft which, according to plaintiff, was not even needed by Coastal. In its report the Committee found that the lease had been poorly drafted and that as a result of certain ambiguities in it Wyatt had received some $60,000 in overpayments. It also found that as a result of a clerical error the corporation had been double-billed some $135,000 for maintenance costs. It noted, however, that upon learning of this (after this suit had been filed) Wyatt had voluntarily repaid some $200,000 in excessive payments to the corporation and thus the Committee concluded that plaintiff's allegations as to the lease of the aircraft were without merit because the errors had resulted from "a lack of care in administering the lease" and not from an "intentional wrongdoing" on the part of Wyatt.

Plaintiff interprets the Committee's conclusion on this point to be cavalier in view of its accompanying finding that such aircraft leases are normally based upon a flat monthly fee while the lease with Wyatt required the monthly fee to be calculated on the basis of hours flown. He also suggests that the double-billing error raises serious questions about the controls in place at Coastal with regard to dealings between Wyatt and the corporation, and he suggests further that the willingness of the Committee to sweep the matter under the rug because of the voluntary repayment by Wyatt indicates bad faith as well

**516**

as an inadequate investigation on the part of the Committee.

Also with regard to the adequacy of the Committee's investigation plaintiff notes that in its report the Committee did acknowledge that Wyatt was "peripherally involved in the spot market" and in oil trading activity. It further found that there were occasions "when Mr. Wyatt did become involved in an individual transaction." Despite this the Committee did not make inquiry into any specific transaction in which Wyatt participated. In view of his allegations of personal "skimming" by Wyatt, plaintiff brands as inexcusable this failure of the Committee to follow-up on its information and to investigate specific trading transactions in which Wyatt was involved.

Finally, plaintiff points to the Committee's approach to the "Coastal Kansas" transaction as an indication of the inadequacy of its investigation. As noted earlier, the "Coastal Kansas" was purchased by Coastal from Koch Industries. It was purchased in 1978 for $4 million and declared unseaworthy a year later. In order to resurrect the vessel, a deal was made to sell it to the defendant WJS for the sum of $1 million plus the cost of repairs, which was then anticipated to be in the vicinity of $9 million. WJS was then to lease the repaired vessel back to Coastal at the rate of $1,970,000 per year for a period of years, after which ownership of the vessel was to be returned to Coastal.

WJS was formed originally as a partnership in which Carl Wyatt, the son of the defendant Wyatt, had a 56% interest. WJS was later incorporated as a Delaware corporation. Shortly thereafter Phoenix Petroleum Company ("Phoenix") acquired an 86% ownership interest in WJS, with Carl Wyatt retaining a 10% interest. Phoenix, in turn, was owned by one Tracy DuBose, a former director and executive officer of Coastal and allegedly a long-time personal friend and business associate of the defendant Wyatt. Another son of the defendant Wyatt was employed by Phoenix. Plaintiff

has reason to believe that at some point Wyatt had guaranteed personally a $5 million line of credit to Phoenix as an accommodation to DuBose. Thus did plaintiff have reason to suspect that the defendant Wyatt was in control of the "Coastal Kansas" sale and leaseback transaction.

In its report the Special Litigation Committee focused on the fairness to Coastal of the sale and lease-back transaction and, finding it to have been a fair deal to Coastal deriving from arm's length bargaining from which the defendant Wyatt purposely abstained because of the involvement of his son, the Committee concluded that the plaintiff's allegations on the issue were without merit. Plaintiff says, however, that in so doing the Committee made no effort whatsoever to investigate the relationship between Phoenix and DuBose, on the one hand, and the Wyatt family and Coastal on the other. Specifically, it never sought to discover how WJS was capitalized nor did it seek the identity of the *original shareholders* of WJS. Nor did it ascertain whether or not Wyatt had guaranteed a $5 million loan to Phoenix. For these and other reasons plaintiff argues that the Committee's investigation of the transaction was inadequate and that as a consequence there was no reasonable basis for its conclusion that the defendant Wyatt exercised no control over WJS or the transaction itself.

Also, plaintiff asserts that the Committee's finding as to the fairness of the "Coastal Kansas" transaction was premised on materially erroneous information. Of significance in the Committee's conclusion that the transaction derived from arm's length bargaining exclusive of any participation or influence by Wyatt was its finding that the annual rental for the repaired tanker which was originally proposed to be $1,970,000 per year was negotiated down by the Coastal board and management to a rate of $1,845,000 before the transaction was finalized, a reduction of $125,000 per year. Plaintiff, however, points to three consecutive annual reports

of Coastal which state that the annual charter rate for the "Coastal Kansas" for the years 1981, 1982 and 1983 was approximately $2,700,000 for each year. Thus, he argues that the Committee did not even use the correct information in evaluating the "Coastal Kansas" transaction, which, in turn, is graphic evidence of the inadequacy of the investigation on which its conclusion and recommendation was based.

## V

As noted previously, the foregoing by no means constitutes all of the reasons on which the plaintiff relies for his position that the Special Litigation Committee has failed to meet its burden under *Zapata* and that as a consequence its motion to dismiss the action should be denied. There are more. However, the points just mentioned—which I make out to be seventeen in number—serve to illustrate the runaway status into which a motion to dismiss brought by a Special Litigation Committee can deteriorate in a given case. And needless to say, the Committee has an answer or explanation for each of the various points raised by the plaintiff.

I shall make no effort to go over each and every response of the Committee in detail. Suffice it to say that the Committee takes the position that despite all of the plaintiff's blustering about the alleged conflicting corporate interests of Mr. Marshall, there is no evidence whatever as to any personal dealings between either Marshall and Wyatt or between Marshall and Coastal, and that Marshall is considered as an independent, outside director of Coastal in the legally accepted sense of the term. As to Marshall's status as a member of Coastal's board at the time of the acts complained of by plaintiff, the Committee points out that the recent decision in *Aronson v. Lewis*, Del.Supr., 473 A.2d 805 (1984) makes it clear that such a factor does not make Marshall an interested director or strip him of his independence from the standpoint of being able to exercise his

business judgment as to the merits of plaintiff's derivative claims.

As to the late Raymond M. Holliday, the other member of the Committee, it is noted that the plaintiff makes no quarrel with either his independence or good faith in participating in the investigation and the formulation of the report. Thus, his personal affidavit in support of the Committee's good faith and independence, and the reasonableness of its investigation and conclusion stands unassailed.

As to plaintiff's charges against the Brown, Wood firm, the Committee notes that the plaintiff raised no issue as to the propriety of that firm acting as counsel to the Committee until 10 months after the lengthy investigation was completed and the Committee's report filed. The Committee also notes that by limiting his attack on the Brown, Wood firm to the suggestion that it may be biased personally against his attorneys for unrelated reasons, plaintiff is conceding in effect that the Brown, Wood firm is independent of Wyatt and Coastal, it having had no prior professional relationship with either. As to the destruction by Brown, Wood of the original, handwritten interview notes of its attorneys in favor of a prepared summary of each interview, the Committee points out that such a procedure is routinely engaged in by law enforcement agencies and has been approved by the courts, *United States v. Pacheco*, 489 F.2d 554 (5th Cir.1974), *cert. denied*, 421 U.S. 909, 95 S.Ct. 1558, 43 L.Ed.2d 774 (1975), an argument which plaintiff does not dispute.

As to the "Coastal Kansas" transaction, the Committee suggests that the plaintiff is grasping at straws. It says that the $2,700,000 figure used in Coastal's annual reports was never intended to reflect the actual rental payments made for the tanker each year as indicated by the qualifying language in the reports stating that it was "estimated" that the lease payment would be "approximately" that figure. It points out that on Coastal's Form 10–K for 1979 as well as in its 1980 and 1981 proxy state-

ments it was plainly disclosed that the annual rental rate for the tanker was not a fixed rate but rather was a floating rate based upon the actual cost to WJS to repair the vessel and WJS's variable interest costs. The finalized transaction—which produced the $125,000 annual savings as a result of alleged arm's length bargaining by Coastal's management—was based on anticipated repair costs of $9 million and a then assumed borrowing rate to WJS of 12%. In actuality, the repair cost jumped quickly thereafter to $10 million and the interest rate went to 17½%. Thus, because of the understanding as to the floating rate, the annual rental did rise to near the $2.7 million figure. But, says the Committee, the overwhelming and unrebutted facts of the matter indicate that it was nonetheless a very good deal for Coastal which was negotiated at arm's length between Coastal and WJS with the defendant Wyatt purposely remaining out of the negotiations. Thus, the Committee takes the position that its investigation of the transaction was adequate and that there was no call to investigate the status of personal relationships between Wyatt and his family and DuBose.

As to the so-called Roeber memorandum, the Committee points out that the plaintiff deliberately withheld the document from the Committee until after its representatives had travelled to London and interviewed Durels. Moreover, the Committee says that in interviewing Durels it was interested in learning what, if anything, he knew about the allegations of skimming by the defendant Wyatt as contained in plaintiff's complaint. It was not focusing on anything in particular that had been said in the London meeting between Weiss, Roeber and Durels which predated the filing of the suit. Thus, the Committee takes the position that the later production of the Roeber memorandum by the plaintiff—which his counsel apparently had all along—certainly created no duty on its part to return to London so as to interview Durels personally on the content of the memorandum. The Committee says that

this is particularly true in light of its view that the Roeber memorandum contains nothing of any consequence anyway with regard to the alleged improper conduct of Wyatt. Moreover, at the direction of plaintiff's counsel Roeber himself refused to be interviewed by the Committee, as did Mr. Weiss.

This leads to the final aspect of the Committee's justification of the adequacy of its investigation. As to plaintiff's charge that it failed to investigate any specific oil trading transaction in which Wyatt was involved, the Committee points out that as yet, after more than three years, plaintiff has failed to identify any particular transaction in which he was involved. And this is true despite the fact that on four separate occasions the request was made on behalf of the Committee to have the plaintiff's attorneys provide it with any information that plaintiff had concerning the alleged skimming on the part of Wyatt or information concerning anything else that the plaintiff felt should be investigated. All such requests were ignored by plaintiff and his counsel. In addition, the Committee stated in its report that of all the persons interviewed in the course of its lengthy investigation, not one was able to identify any specific oil trading transaction in which the defendant Wyatt was involved.

## VI

Having waded at length through the morass of factual assertions and arguments thus put forth, I reach the conclusion that the motion to dismiss the complaint should be granted.

*Zapata* instructs that a motion to dismiss such as has been presented here shall be appropriately supervised by the Court under a standard "akin to proceedings on summary judgment." As to the limited issues presented by the motion—they being presumably "the independence and good faith of the Committee and the

bases supporting its conclusions"—the "moving party"—here the corporation as represented by the Special Litigation Committee—is required "to meet the normal burden under Rule 56 that there is no genuine issue as to any material fact and that the moving party is entitled to dismiss as a matter of law." 430 A.2d 789. To one ingrained over the years with the normal summary judgment practice and the legal principles developed with respect thereto, the diversion created by attempting to apply summary judgment standards to a motion to dismiss predicated upon issues unrelated to the cause of action alleged in the complaint makes for a somewhat awkward adjustment. Nonetheless, I make the maiden effort as follows.

■ Applying the procedural rationale of *Zapata* as previously discussed herein, I am convinced that there are no material facts in dispute concerning what was actually done or not done by the Special Litigation Committee during its investigation of the allegations of the plaintiff's complaint. And it seems to me that what the Committee did or did not do, and the actual existence of the documents and persons purportedly examined by it, should constitute the factual record on which the decision as to the independence and good faith of the Committee, and the adequacy of its investigation in light of the derivative charges made, must be based.

■ Stated another way, it does not seem to me that the facts and circumstances relating to the plaintiff's allegations of wrongs to the corporation should furnish the basis for the application of the summary judgment requirement that there be no genuine dispute as to any material fact. Rather, it is the conduct and activity of the Special Litigation Committee in making its evaluation of the factual allegations and contentions contained in the plaintiff's complaint which provide the measure for the Committee's independence, good faith and

investigatory thoroughness. This is because it is the Special Litigation Committee which is under examination at this first-step stage of the proceedings, and not the merits of the plaintiff's cause of action. Applying this approach I find that there is no genuine dispute of material fact as to what the Special Litigation Committee did here or as to the information actually utilized by it in reaching its conclusions.

Proceeding on from this finding, I am satisfied from the undisputed material facts thus made applicable to the motion that the Special Litigation Committee, as comprised of Mr. Marshall and Mr. Holliday, together with Brown, Wood, their counsel, operated independently of the defendants Wyatt and WJS as well as independently of Coastal's board and management, and this despite the undisputed charge that house counsel for Coastal assisted the Committee in scheduling its numerous interviews and sat in on interviews in which the personnel of Coastal were involved. While it seems to me that it would be better if such a practice was avoided, I cannot find from the bare circumstance relied on by the plaintiff, without more, that the scheduling of Committee interviews by members of corporate management and the attendance of corporate house counsel at the Committee interviews of corporate employees warrants a finding that the Special Litigation Committee was not independent of those in charge of the corporation during the conduct of its investigation. Thus, I find as a matter of law that the Special Litigation Committee acted independently in making its investigation and report.

I find further as a matter of law that the Special Litigation Committee acted in good faith and that the investigation made by it was adequate to support the conclusions and recommendation reached. The report of the Committee appears to be comprehensive and well documented and gives indication of a reasonable and thorough investi-

gation of the plaintiff's allegations. The broadside fired against it by the plaintiff based upon additional things which he feels the Committee should have done and the conclusions that he would have the Court draw by innuendo from the manner in which certain things were done is not sufficient to overcome the showing made by the Committee in my opinion.

■ Accordingly, pursuant to the first-step analysis required by *Zapata,* as I interpret the mandate of that decision, I find that the Special Litigation Committee, on behalf of the corporation, has carried its burden and has demonstrated that there is a reasonable basis for its recommendation that it is in the best interests of the corporation to have the derivative suit of the plaintiff dismissed.

## VII

■ Having reached the foregoing conclusion, I find it unnecessary to proceed to the discretionary, second-step analysis authorized by *Zapata.* As stated in the lengthy quotation from *Zapata* set forth at the outset, the discretionary second step "is intended to thwart instances where corporate actions meet the criterion of step one, but the result does not appear to satisfy its spirit, or where corporate actions would simply prematurely terminate a stockholder grievance deserving of further consideration in the corporation's interest." 430 A.2d 789. The dismissal of this suit does not run counter to the spirit of *Zapata* as I comprehend it, and based upon the record made on the motion to dismiss when weighed against the allegations of the complaint, I do not find that the termination of this suit will prematurely end a stockholder grievance which, in the interest of the corporation, deserves further consideration through the device of derivative litigation. I reach this determination for two reasons.

First, the "Coastal Kansas" transaction and the lease by Wyatt of the Westwind

aircraft to the corporation do not appear to be matters of sufficient substance to warrant further protracted litigation and disruption of corporate affairs. The Special Litigation Committee has found that the Westwind lease has been adjusted to properly reflect the type of aircraft lease that is customary within the industry, and during the process of the investigation it has further found that the corporation has received reimbursement for its overpayments. In view of the expense and distraction that would be involved, it would seem potentially counter-productive to the corporation to pursue a claim against Wyatt arising out of the lease when the issue would apparently turn on whether there was a deliberate attempt on his part to wrongfully misdirect corporate funds for his personal use as opposed to inadvertance and clerical mistake on the part of those involved. The dismissal of such a claim under these circumstances as being in the best interests of the corporation would seem to be within the spirit of *Zapata.*

Likewise with the "Coastal Kansas" matter. The Special Litigation Committee has concluded from its investigation that the transaction was passed upon by various levels of Coastal's management and found to be a reasonable business opportunity from the standpoint of the corporation. The Committee is satisfied that the transaction was fair to Coastal and that Wyatt had no part in its structuring. In contrast, the focal point of plaintiff's charge is that the transaction must have been unfair to Coastal because Wyatt, due to the involvement of his son and his friend DuBose, personally had reason to influence its making. The reasonably investigated decision of the Special Litigation Committee that it would not be in the best interests of the corporation to pursue the allegation under such circumstances would, again, appear to be within the spirit of the *Zapata* rationale.

Secondly, by far the most serious of the plaintiff's allegations is his charge that

Wyatt was "skimming" oil trading profits which rightfully belonged to Coastal. While no amount of any such skimming profits has been alleged in the complaint, figures of up to $500 million were suggested from time to time during the course of the proceedings. Despite the seriousness of the allegations, however, and despite the fact that the suit has now been pending for more than three years, there is yet to be put before the Court any indication—let alone any evidence—of any specific transaction in which Wyatt personally "skimmed" anything rightfully belonging to Coastal. And this is so despite the fact also that the Committee, to no avail, requested of the plaintiff on more than one occasion that he furnish it with any indication of such improper transactions that he or his counsel might have in order that it might be investigated by the Committee. In view of this status of affairs I fail to see how I could reasonably conclude that the plaintiff's grievance as to the alleged "skimming" by Wyatt is deserving of further consideration in the corporation's interest.

## VIII

Accordingly, for the reasons given I shall cut the matter off at step one of the *Zapata* procedure and grant the motion to dismiss the complaint made by the Special Litigation Committee on behalf of the corporation. An appropriate form of order may be submitted, on notice.