## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| KEVIN DIEP, derivatively on behalf of EL POLLO LOCO HOLDINGS, INC., | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) | C.A. No. 12760-CM |
| | ) | |
| STEPHEN J. SATHER, LAURANCE ROBERTS, EDWARD VALLE, KAY BOGEAJIS, DOUGLAS K. AMMERMAN, SAMUEL N. BORGESE, and TRIMARAN POLLO PARTNERS, L.L.C., | ) ) ) ) ) ) ) ) | |
| Defendants, | ) ) | |
| and | ) ) | |
| EL POLLO LOCO HOLDINGS, INC., | ) ) | |
| Nominal Defendant. | ) | |

## MEMORANDUM OPINION

Date Submitted: April 23, 2021
Date Decided: July 30, 2021

Peter B. Andrews, Craig J. Springer, David M. Sborz, ANDREWS & SPRINGER LLC, Wilmington, Delaware; Hung G. Ta, JooYun Kim, Natalia D. Williams, HUNG G. TA, ESQ. PLLC, New York, New York; Peter Safirstein, Elizabeth S. Metcalf, SAFIRSTEIN METCALF LLP, New York, New York; *Counsel for Plaintiff*.

Kurt M. Heyman, Elizabeth A. DeFelice, Jamie L. Brown, HEYMAN ENERIO GATTUSO & HIRZEL LLP, Wilmington, Delaware; Adam H. Offenhartz, GIBSON, DUNN & CRUTCHER LLP, New York, New York; Tyler H. Amass, GIBSON, DUNN & CRUTCHER LLP, Denver, Colorado; *Counsel for the Special Litigation Committee*.

**McCORMICK, C.**

El Pollo Loco Holdings, Inc. ("EPL" or the "Company") owns and franchises fast-casual restaurants with a chicken-based menu. The Company raised its menu prices three times between July 2014 and January 2015 while simultaneously experimenting with new variations on its menu. Customers were not crazy about the changes. During a May 2015 earnings call, the Company announced lowered guidance for the second quarter but downplayed factors that may have led to the decline. Company insiders later sold large amounts of their EPL stock before second-quarter results were announced and the price of the Company's stock dropped.

EPL stockholders asserted insider trading claims in this court and in federal court. After this court denied a motion to dismiss, the Company formed a special litigation committee to investigate the claims. The committee concluded that the information on which the insiders allegedly traded was immaterial and that the insiders lacked the scienter to support the stockholders' claims. The committee then moved to dismiss the complaint.

Under *Zapata Corporation v. Maldonado*,[1] when resolving a motion to dismiss filed by a special litigation committee, the court evaluates the independence and good faith of the committee and the bases supporting its conclusions. The court then applies its own independent business judgment to determine whether dismissal is in the best interests of the corporation. This decision finds that the special litigation committee has met its burden under *Zapata* and grants the motion to dismiss.

---

[1] 430 A.2d 779 (Del. 1981).

## I.    FACTUAL BACKGROUND

The factual background is drawn from the record submitted by the special litigation committee and the plaintiff, which includes the special litigation committee report (the "SLC Report"), the 408 exhibits attached to the report, transcripts of the depositions taken of two of the committee's members, and a handful of additional exhibits that speak to the committee's investigation and the independence of its members.[2]

### A.    El Pollo Loco

The Company is a Delaware corporation headquartered in Costa Mesa, California.[3] It describes itself as "a differentiated and growing restaurant concept that . . . offer[s] the quality of food and dining experience typical of fast casual restaurants while providing the speed, convenience, and value typical of traditional quick-service restaurants."[4]

The Company strives to offer its customers "healthier alternatives to traditional food on the go" and to appeal to "a wide variety of socio-economic backgrounds."[5]  True to its

---

[2] *See* C.A. No. 12760-CM, Docket ("Dkt.") 62 Ex. A ("SLC Report"); Dkts. 62–136 (SLC Report Exhibits); Dkt. 164 ("Brown Decl.") Exs. A–C (attaching deposition transcripts and SLC correspondence); Dkt. 168 Exs. A–D (attaching deposition transcript excerpts and additional exhibits); Dkt. 172 Exs. D–H (same).

[3] SLC Report at 3.

[4] SLC Report Ex. 323 at 3.  The restaurant industry classifies "limited service" restaurants as either "QSR"—quality service restaurants—or "fast casual."  The Company describes itself as "QSR+" because it combines "the food and dining experience of a fast casual restaurant and the speed, value, and convenience of a QSR."  *Id.*

[5] *Id*.

2

name, EPL's menu primarily comprises "chicken meals" and its signature product is a "citrus-marinated fire-grilled chicken."[6]

### B. Trimaran Buys EPL.

In November 2005, the private equity firm Trimaran Capital Partners ("Trimaran") acquired EPL for approximately $400 million through an acquisition vehicle, defendant Trimaran Pollo Partners, LLC ("Pollo Partners").[7] Dean Kehler is one of Trimaran's founders and sits on the EPL board of directors.[8] He is also one of two managing members of Trimaran Capital, L.L.C., which is the managing member of Pollo Partners.[9]

Pollo Partners' membership comprises entities under Trimaran's umbrella, with one exception—private equity firm Freeman Spigoli & Co ("Freeman Spigoli").[10] Until June 30, 2015, four of EPL's seven directors were affiliates of either Trimaran or Freeman Spigoli. EPL's board expanded to eight directors, including Kehler and two others affiliated with either Trimaran or Freeman Spigoli.[11]

---

[6] *Id.*

[7] SLC Report at 5.

[8] *Id.* at 4, 7.

[9] *Id.* at 5–6.

[10] *Id.* at 6.

[11] *Id.* at 7. The other two are nonparties Michael Maselli and John Roth. Maselli is a Trimaran managing partner and the chairman of EPL's board. *Id.* Roth is Freeman Spigoli's CEO and a director on EPL's board. *Id.* The fourth affiliated director, Wesley Barton, was a Trimaran employee and resigned from EPL's board on June 30, 2015. *Id.* at 7 & n.58.

## C.   Trimaran Takes EPL Public.

Pollo Partners completed an initial public offering of EPL in July 2014 (the "IPO") and a secondary offering in November 2014 (the "Secondary Offering").[12]   In the IPO, Pollo Partners sold approximately 8.2 million shares of its EPL common stock at $15 per share.[13]   In the Secondary Offering, Pollo Partners sold over six million shares of its EPL common stock at $27 per share.[14]   After the Secondary Offering, Pollo Partners held just over 22 million shares—approximately 59.2%—of EPL's outstanding common stock.[15]

## D.   EPL's Insider Trading Policy

To promote compliance with the federal securities laws, EPL adopted an insider trading policy (the "Policy") prohibiting EPL insiders from selling their stock outside of pre-established "Trading Windows."   The Policy applied to EPL's "directors, officers, employees and service providers" and to "corporations or other business entities controlled or managed by" those fiduciaries.[16]

Under the Policy, covered persons and entities "may only purchase or sell Company securities if the following three requirements are satisfied:   (1) [they] are not aware of material non-public information . . . ; (2) the purchase or sale falls within the Trading

---

[12] *Id.* at 6.

[13] *Id.* at 202.

[14] *Id.*

[15] *Id.* at 6, 202.

[16] SLC Report Ex. 88 at 2.

Window . . . ; and (3) the trade was pre-cleared under the Company's mandatory pre-clearance policy . . . ."[17]

The Trading Window "begins two . . . full trading days after the Company's public announcement of its annual or quarterly earnings and ends twenty-one . . . calendar days prior to the end of the then current quarter."[18]  During the Trading Windows, covered persons must "first obtain pre-clearance of the purchase or sale" of EPL stock from the Company's Chief Legal Officer.[19]  Requests for clearance to trade must be submitted "at least two . . . business days in advance of the proposed purchase or sale, unless the Chief Legal Officer agrees to a shorter period."[20]  At all relevant times, EPL's Chief Legal Officer was Edith Austin, who served as the Vice President of Legal and as the Corporate Secretary."[21]

As private equity investors, Pollo Partners' members "had always intended to sell down [Pollo Partners'] ownership of ELP stock over time."[22]  Due to the Policy, however,

---

[17] *Id.* at 8.

[18] *Id.*

[19] *Id.* at 9.

[20] *Id.*

[21] SLC Report at ix.  Neither Ms. Austin, nor any other member of EPL's legal department are lawyers.  *See id.* at 281 n.1970.

[22] *Id.* at 201.

5

the first Trading Window after the IPO did not open until May 19, 2015, and only lasted through June 10, 2015.[23]

On April 23, 2015, Austin emailed EPL insiders alerting them of the upcoming Trading Window, attaching the Policy, and reminding them of the need to request pre-clearance and obtain written approval before executing any transactions in EPL stock.[24]

### E. Events Leading Up to the First Trading Window

EPL increased the prices of its menu items twice in 2014 and once in 2015. First, it increased the prices of seventeen of its menu items by 0.5% "in response to a minimum wage hike"[25] on July 3, 2014.[26] Second, EPL increased the prices of forty-three of its menu items by approximately 1% as a "brand decision" to "cover costs to drive top line sales" and as one of many Company actions to "combat labor inflation"[27] on October 16, 2014.[28] Then, on January 29, 2015, EPL increased the prices of thirty-two menu items by approximately 1%, primarily targeting products whose price had not increased in prior years.[29] Combined with the two 2014 price increases, the 2015 price increase produced an

---

[23] *Id.* at 203.

[24] SLC Report Ex. 88.

[25] SLC Report at 112, 114.

[26] *Id.* at 112.

[27] *Id.* at 116–18.

[28] *Id.* at 115–16.

[29] *Id.* at 122–23.

6

overall "3.0% pricing increase across the menu, which . . . had never been done over the course of one year."[30]

EPL's marketing, finance, and operations teams routinely analyzed the Company's performance to generate reports assessing the Company's success and forecast future results.[31] Ryan Hawley had served as the Company's Vice President of Marketing Planning & Analysis since 2012 and was responsible for "develop[ing] and refin[ing] the Company's pricing strategy and . . . developing pricing recommendations."[32]

Hawley's role involved generating both daily and weekly reports analyzing EPL's business and forecasting sales for the Company, which he would use to make pricing recommendations to EPL's executive management team.[33] His responsibilities included analyzing consumer responses to EPL's price increases. He did so, in part, by tracking the Company's value metrics, which comprise two categories of value: first, "the combination of the brand, food, service, environment divided by the price;" and second, "the specific price competitiveness and 'value for money' questions used" in consumer surveys.[34] Put

---

[30] *Id.* at 114–15.

[31] *See id.* at 68–76 (describing the functions and responsibilities of the various teams in connection with the Company's management).

[32] *Id.* at 69.

[33] *Id.*

[34] *Id.* at 120.

simply, while "pricing is a function of the value that a consumer perceives from a brand," it is not derived solely from quantifiable metrics like menu prices.[35]

Hawley also analyzed consumer responses to EPL's price increases by tracking one of the Company's "key performance metrics" of Same Store Sales ("SSS").[36] SSS is "the percentage change in comparable same-store sales on a year-over-year basis,"[37] and Hawley is "the sole employee responsible for forecasting SSS at EPL."[38] The SSS metric focused on total sales, representing a combination of both the number of transactions and the size of each transaction, or check. For example, after the second price increase in 2014, December 2014 transactions growth was 2.2% from the prior year, the average check amount grew 3.2% from the prior year, and SSS had increased 5.5% from the prior year.[39]

When considering changes to EPL's pricing, Hawley evaluated the impact it could have on the Company's value metrics and sales results.[40] Given the "many ups and downs" in the Company's value-tracking metrics, the Company's "bigger concern" focused on "the general trend over time, not any specific drop."[41] Beginning just after the third price

---

[35] *Id.*

[36] *Id.* at 96.

[37] *Id.* at 51 n.339.

[38] *Id.* at 99.

[39] *Id.* at 122. Similarly, November 2014 SSS growth was 7.4%, while transaction growth was 2.6% and average check growth was 4.7%. *Id.*

[40] *See id.* at 125–26.

[41] *Id.* at 125.

increase, the Company began to experience volatility in its sales, which were lower than EPL had projected.[42]

By mid-April, Hawley began preparing materials for the EPL board's upcoming meeting.[43] The meeting, scheduled for May 11 and 12, 2015, involved two days of board presentations regarding financial updates, as well as a four-hour Management Team Presentation that covered topics ranging from marketing and supply chain management to development, operations, information technology, and franchising.[44]

From April 15 to May 6, 2015, members of EPL's various teams coordinated in preparing and reviewing the May 11 presentation (the "Board Presentation") and the May 12 presentation (the "Management Presentation" and, with the Board Presentation, the "Presentations").[45] Relevant players included then-Chief Marketing Officer Edward Valle, Director of Financial Planning & Analysis Edward Shih, then-Director, President, and Chief Executive Officer Stephen Sather, and Chairman of EPL's board and Managing Director of Trimaran Michael Maselli,.[46] The "Executive Management Team," comprising Sather, Valle, EPL's Chief Financial Officer Laurance Roberts, and then-Chief Operating

---

[42] *See id.* at 126–27.

[43] *See id.* at 127.

[44] *See id.* at 132, 141.

[45] *Id.* at 127–31.

[46] *See id.*; *see also id.* at ix–xi (identifying relevant individuals).

9

Officer Kay Bogeajis, also "reviewed the presentations and provided feedback before circulating them to the Board."[47]

On May 5, 2015, after the May 11 presentation had undergone several revisions, Sather sent Maselli the results of a customer survey that revealed a decline in EPL's value score from 59.6% in April to 58.1% in early May.[48] Sather asked Maselli to "keep this between us at this point," which Maselli understood to refer to the preliminary nature of the data—the sample size was "less than 15.5% of the likely total responses for the month."[49]

EPL's directors and officers received copies of the Presentations on May 6, 2015, though Hawley's daily-updated numbers continued to change between then and the May 11 and 12 board meetings.[50]

### 1. May 11 Board Meeting

The entire EPL board and Executive Management Team, as well as several Company executives and representatives of Freeman Spigoli, attended the May 11 meeting.[51] In addition to remarks by Sather and certain other administrative matters, the

---

[47] *Id.* at 127; *see also id.* at ix–xi (identifying relevant individuals).

[48] *Id.* at 129 & n.954.

[49] *Id.* at 129.

[50] *See id.* at 130–31.

[51] *Id.* at 132.

financial updates in the Board Presentation—given by Roberts—made up the "bulk" of the meeting.[52]

At a high level, Roberts informed the board that "Company SSS"[53] for the first quarter of 2015 was 3.5%, a decline from the Company's forecast.[54] He explained that despite falling short of EPL's plan, "Company SSS of 3.5% was still a 'decent number,'" because "EPL had been 'running high' at the time."[55] The directors were generally unconcerned by this number and felt that "the first quarter is often harder to predict because it follows the holidays" and that "the Company's performance and prospects had been very positive."[56]

The financial presentation also included updates to the Company's projected SSS for the second quarter of 2015. Specifically, EPL lowered its projected Company SSS for the second quarter from 4.7% down to 2.6% based on first quarter sales and actual second quarter results as of May 4, 2015.[57] As usual, the new projection "was generated in large part by Mr. Hawley."[58]

---

[52] *Id.*

[53] "Company SSS" refers to the SSS for only Company-owned restaurants, as opposed to franchised restaurants.

[54] SLC Report at 132–33.

[55] *Id.* at 133.

[56] *Id.*

[57] SLC Report at 133–34.

[58] *Id.* at 135.

11

The Board Presentation provided the updated figures without exploring the reasons behind the depressed SSS numbers.[59]   Neither the EPL board nor the Executive Management Team voiced any serious concerns with the new projected Company SSS for the second quarter.[60]   In fact, management still felt confident in the Company's System-Wide SSS[61] projections for the year "because it believed that Q3 and Q4 could make up for lackluster performance in the first half of the year."[62]   The board cited optimism regarding a promising "pipeline" of menu additions that "had previously been successful," which would begin on May 21, 2015.[63]

### 2.   May 12 Board Meeting

The entire EPL board except for one director, Samuel Borgese, as well as certain Company executives and representatives of Freeman Spigoli, attended the May 12

---

[59] *See id.* at 132–139.

[60] *See id.* at 135–36.

[61] "System-Wide SSS" refers to the SSS for both Company-owned and franchised restaurants.

[62] SLC Report at 136.

[63] *Id.* at 136–37; *see id.* App. A at A-5.  One such addition, the Hand-Carved Salads module, proved unsuccessful, though the board's optimism was genuine.  *See id.* at 139, 196 n.1388 ("EPL management was optimistic about the upcoming introduction of Hand-Carved Salads . . . [as] a significant basis for the expectation that the Company could hit the System-Wide SSS forecast of 3.0–5.0% for the year, as well as the 2.5% Company SSS for Q2.").

Management Presentation.[64]  Hawley took the lead in preparing and giving the bulk of the

Management Presentation.[65]

Unlike the Board Presentation, the Management Presentation had been updated after

May 6.[66]  Also unlike the Board Presentation, the Management Presentation explored

possible explanations for the dip in SSS.[67]  For example, Hawley attributed slow first-

quarter growth to "New Year's Holiday Timing," noting that "transactions growth

improved throughout the remainder of Q1 2015."[68]

During his presentation, Hawley discussed the pricing increases that the Company

had recently implemented.  He noted that growth in the amount-per-transaction had slowed

since the end of 2014 and that sales of the individual menu items subject to the 2015 pricing

increase had declined.[69]  He concluded that the "2015 pricing action had 'led to lower total

sales.'"[70]

Hawley also discussed the recent decline in EPL's value scores.  He noted that in

2014, 71% of consumers answered "yes" when asked whether EPL "provides good value

---

[64] *Id.* at 141.

[65] *Id.* at 142.

[66] *Id.* at 140–41.

[67] *See id.* at 142–65.

[68] *Id.* at 143.

[69] *Id.* at 144–45.

[70] *Id.* at 145.

for the money," but that in the first quarter of 2015 only 54% of consumers responded affirmatively.[71]

Various members of the board and the Executive Management Team discounted Hawley's conclusion on the basis that Hawley's data "failed to tell the entire story."[72] For example, Valle felt that the decline in sales resulted from the erroneous prioritization of steak and shrimp items over the Under 500 Menu, which he believed "could shape EPL as a health-conscious brand."[73]

Despite the timing of the decline in value scores in connection with the early-2015 price increase, "both the Executive Management Team and Directors . . . gave relatively little weight to the . . . value scores."[74] The results were based on insufficient sample sizes and erroneous comparisons, and had come from a new market research firm that EPL had not yet grown to trust—the Management Presentation contained "the first complete set of data that the vendor had collected for EPL."[75]

Hawley acknowledged that the firm was untested, the data unreliable, and the results not indicative of an actual decline in value scores.[76]

---

[71] *Id.* at 147 (cleaned up).

[72] *Id.* at 145.

[73] *Id.* at 146.

[74] *Id.* at 147.

[75] *Id.* at 148.

[76] *See id.* at 151–56.

Hawley's SSS forecast declined based on sales during the week between the May 6 completion of the Management Presentation and the presentation itself.[77] Attendees of Hawley's Management Presentation understood that his forecasted 2.5% Company SSS growth did not incorporate his most recent weekly forecast.[78] They further understood that "one particular week does not represent an entire quarter," and typically focus on the forecast Hawley "provided at the beginning of the quarter or period . . . not the forecast in [Hawley's] Daily Sales Updates."[79] Hawley also explained that "the simultaneous promotion of both" shrimp and beef—two higher-priced proteins—on the menu "was potentially impacting the Company's sales" resulting in the lower sales numbers.[80]

### 3. May 14 Earnings Call

On May 14, 2015, EPL publicly reported the results from its first quarter in a Form 10-Q.[81] In its Form 10-Q, EPL reported an increase in Company SSS of 3.4% over

---

[77] *Id.* at 131.

[78] *See id.* at 160.

[79] *Id.* at 161 ("Mr. Hawley explained that, although weak SSS for a few days 'knocks [the] number down a little bit,' the Company still targets his initial forecasts 'because there's organizational alignment around hitting a forecasted number.'" (alteration in original) (quoting SLC Report Ex. 348)).

[80] *Id.* at 162.

[81] *Id.* at 96; SLC Report Ex. 203.

15

the prior year.[82] EPL had previously forecasted a 4.3% increase in Company SSS for the first quarter of 2015, so the 3.4% figure demonstrated a failure to meet forecasted results.[83]

That evening, the Company held an earnings call with investors to discuss its first quarter results (the "Earnings Call").[84] The Earnings Call included a scripted and pre-recorded presentation followed by a live Q&A session with investors.[85] Preparing for the Earnings Call involved exchanging several internal drafts of both the call script and the talking points for the Q&A session.[86]

Prior to the Earnings Call, "it had not been EPL's practice to comment on quarters in progress while reporting the prior quarter's results."[87] Because "the SSS forecasts and projections indicated that the Company was likely to miss the quarterly earnings per share" forecast, Roberts raised the possibility of reporting some second-quarter guidance in the Earnings Call, which otherwise would have focused only on reporting results from the first quarter.[88] Preparation for the Earnings Call thus included discussions regarding how much

---

[82] SLC Report at 96.

[83] *See id.* at 96–97.

[84] *Id.* at 190.

[85] *Id.* at 170.

[86] *Id.* at 170–71.

[87] *Id.* at 172.

[88] *Id.* at 171–75 ("Mr. Roberts stated that he was the first person to raise the issue of additional messaging regarding Q2 2015's recent sales and that he did not recall any pushback or resistance.").

16

second-quarter forecasting to disclose to adequately "manage the market's expectations" without creating an expectation that the market would continue to receive such detailed forward-looking information "forever."[89]

A May 12, 2015 draft of the Earnings Call script revised by Roberts noted that the Company expected its "comparable restaurant sales to be at the lower end of the range during the second quarter."[90]  Maselli removed the "lower end of the range" language, replacing it with "language stating that EPL did not expect its comparable restaurant sales to be linear on a quarterly basis" and that "[s]econd quarter SSS will be effected [sic] by the strong quarter last year as well as the extended testing of alternative proteins."[91]

The Earnings Call was the Company's third since the IPO, making the drafting process "relatively new" and prompting extensive "back-and-forth" drafting.[92]  Given the novelty of including forecasted results for the second quarter, EPL sent the draft script to outside counsel "to make sure [its] Q2 disclosure is sufficient from an insider-trading standpoint."[93]  And, because of the upcoming Trading Window—the first since the

---

[89] *Id.* at 193.

[90] *Id.* at 175; SLC Report Ex. 164A at 14.

[91] SLC Report at 175–76; SLC Report Ex. 174A at 14.

[92] SLC Report at 176.

[93] *Id.* at 177 (quoting SLC Report Ex. 181).

Company's IPO—Roberts "wanted to ensure that the disclosures made on the Q1 2015 Earnings Call were very thoroughly vetted."[94]

The final version of the script, which Roberts read at the Earnings Call, included the following language regarding second quarter forecasts:

> [W]e continue to expect full-year system-wide comparable restaurant sales growth of 3% to 5%. That said, we do not expect our comparable restaurant sales increases to be evenly split among the remaining three quarters of 2015. During the second quarter, we will be lapping a record high average unit volume quarter as a result of two of our most successful promotions, while simultaneously conducting extended tests of alternative proteins. As a result, we will expect our second quarter comparable sales to be closer to the low end of the range.[95]

The process of drafting the Q&A responses was similar to that of the Earnings Call Script, though the Q&A responses included input from Hawley "regarding the relationship between pricing and EPL's recent performance," as well as "franchise versus company performance, Q1 comps, Houston restaurants," and the impact of price increases on the Company's value scores.[96] Hawley included in his revisions a projected second-quarter Company SSS range of 1.0–2.5% instead of the 2.5% number he included in the Management Presentation.[97] The lowered range "reflected an unlikely scenario in which

---

[94] *Id.* at 178.

[95] SLC Report Ex. 197 at 5.

[96] SLC Report at 183.

[97] *Id.* at 184–85.

the rain, which had been unusually strong in the Los Angeles region . . . had not been the primary cause of the slower sales" and that "the slower sales were due to changing underlying sales trends," though Hawley "ultimately dismissed" that theory.[98]

Roberts removed reference to SSS ranges in the draft, instead noting a "softening of . . . momentum" in second-quarter sales due to a "tough quarter lap given . . . record sales last year" and "the impact of having three proteins on our menu."[99] Roberts further addressed the impact of price increases on value scores by pointing to errors in the Company's marketing as driving value considerations: "Focus on alternative proteins at higher price points looks to be driving softer transactions, not unexpectedly. This is a key learning [sic] for us and we're now adjusting balance of year marketing plan to better balance value with higher price point items."[100]

Hawley responded on May 12, 2015, reinserting SSS ranges for the second quarter and including his revised 1.0–2.5% Company SSS range.[101] He also noted "some potential pushback from consumers on prices" as a response to questions about pricing and value scores.[102]

---

[98] *Id.* at 185.

[99] *Id.* at 186; SLC Report Ex. 165A at 1.

[100] SLC Report Ex. 165A at 2.

[101] SLC Report Ex. 168A at 1.

[102] *Id.* at 2.

The final draft of the talking points for the Q&A session included the language Roberts added but did not include SSS ranges.[103] Although Hawley generated the updated SSS ranges based on "his good faith estimate" of the accurate forecast, he did so "for Mr. Roberts and others so that they could, in their judgment, make disclosures that they considered appropriate," as Hawley "was not responsible for disclosing the appropriate financial data to the public."[104]

The call began with Sather reading the scripted presentation on the first quarter SSS results, the menu items featured, and the development of new restaurants during that quarter.[105] Roberts then read his scripted presentation on first quarter revenue and some of the factors contributing to the decline in Company SSS, including a reduction in same-store transactions and sales due to the timing of the New Year's holiday.[106]

Valle joined the call for the live Q&A session with the investor participants. Attendees included analysts from Robert W. Baird & Company, Morgan Stanley, Jefferies LLC, and William Blair & Company.[107] As predicted, the participants asked questions

---

[103] *See* SLC Report Ex. 193A; SLC Report at 189.

[104] SLC Report at 189.

[105] *Id.* at 190–91.

[106] *Id.*

[107] *Id.* at 190.

20

regarding second quarter SSS forecasting and consumer responses to the recent price increases.[108]

Responding to a question about the sales slowdown going into the second quarter, Roberts explained the impact of testing additional proteins on the menu and its effect on consumer perception of EPL's value.[109] Responding to a question about value scores, Valle explained that the decline resulted from a decreased "visibility of value . . . on our menu" given the higher-priced non-chicken proteins, and not from "price resistance in the higher price points."[110] Sather added that "[v]alue scores remain still one of our best attributes,"[111] relying on value scores as reported by the Company's former market research consultant and not the numbers provided by EPL's new and untested market research firm.[112]

### F.    May 19 Block Trade

EPL's stock price closed at $29.06 per share on May 14, 2015, the date of the Earnings Call.[113] It opened the following morning at $24.96 per share and continued to

---

[108] *Id.* at 191–97.

[109] SLC Report Ex. 197A at 7.

[110] *Id.* at 8.

[111] *Id.*

[112] *See* SLC Report at 196 ("Mr. Sather noted that Market Force was the most accurate value tracker at the time, and scores in that period continued to be strong.").

[113] *Id.* App. C at 2. The Earnings Call occurred in the evening, after the market had closed. *See* SLC Report Ex. 197.

decline over the next few days.[114]  The stock price opened at $24.07 per share on May 19, 2019, the first day of the first Trading Window since the IPO and the expiration of the lock-up agreements.[115]

Though Pollo Partners had considered selling a portion of its EPL stock in the months preceding the Trading Window,[116] it did not formally bring the notion to the EPL board or the Executive Management Team until May 3, 2015, when Maselli emailed Sather regarding a potential sale.[117]  Shortly before the May 11 Board Meeting, Maselli met with Sather, Valle, Roberts, and Bogeajis to inform them of Pollo Partners' desire to sell stock in the upcoming Trading Window.[118]

Wesley Barton, who at the time was both a Vice President of Trimaran and a director on EPL's board, informed Austin of Pollo Partners' desire to sell some of its EPL stock on May 18, 2015.[119]  He further informed her that some of EPL's executives would likely also participate in the sale.[120]  The potential underwriters had requested the individual

---

[114] SLC Report App. C at 2.

[115] *Id.*

[116] *See* SLC Report at 204–08 (describing outreach from financial institutions beginning in March 2015 regarding a potential block sale of Pollo Partners' EPL holdings).

[117] *See id.* at 208; SLC Report Ex. 110.

[118] SLC Report at 208.

[119] SLC Report Ex. 208.

[120] *Id.*

executives' involvement to avoid a subsequent additional block sale and to streamline the administration of the trade, reducing the officers' transaction costs.[121]

Three of EPL's officers sought to participate in Pollo Partners' block sale: Sather, Valle, and Bogeajis.[122] All three requested and obtained pre-clearance from Austin pursuant to the Policy.[123] Pollo Partners did not.[124]

On May 19, 2015, Pollo Partners, Sather Valle, and Bogeajis sold a total of 5,962,500 shares of EPL stock to Jefferies LLC for a total of $130,280,625, or $21.85 per share (the "Block Trade").[125] The breakdown of shares sold and proceeds obtained is as follows:

- Sather sold 360,000 shares for $7,866,000.

- Valle sold 175,000 shares for $3,823,750.

- Bogeajis sold 25,000 shares for $546,250.

- Pollo Partners sold 5,402,500 shares for $118,044,625. Distributed among Pollo Partners' members, Trimaran received $68,122,313, Freeman Spigoli received $39,010,728, and "[o]ther" members received $10,911,584.[126]

---

[121] *See* SLC Report at 207.

[122] *Id.* at 209.

[123] *Id.*

[124] *Id.*

[125] *Id.* at 224–25.

[126] *Id.* at 225.

Trimaran, as Pollo Partners' managing member, negotiated the terms of the Block Trade with Jefferies.[127]  Trimaran's managing members, Kehler and Jay Bloom, authorized the trade on behalf of Trimaran and Pollo Partners.[128]  After the Block Trade, Pollo Partners held 16,746,544 shares of EPL stock.[129]

Two directors on EPL's board, Douglas Ammerman and Samuel Borgese, also sold EPL stock on May 19, though not as part of the Block Trade.[130]  That day, Ammerman "exercised options to purchase 8,795 shares at $12.72 per share and 21,409 shares at $2.62 per share" and then immediately sold those shares and an additional 15,618 shares all at $23.507 per share, for a total of nearly $1.1 million.[131]  Similarly, Borgese "exercised his options and purchased 54,094 shares of EPL stock" and then "immediately sold 11,645 shares of EPL common stock at $24.06 per share" for a total of just over $280,000.[132] Borgese then sold his remaining 42,449 shares on May 29 and June 2, 2015, for $20.92 and $21 per share, respectively.[133]  Combining his three sales, Borgese netted approximately $890,650 for his EPL stock.[134]

---

[127] *Id.* at 220.

[128] *Id.*

[129] *Id.* at 224.

[130] *Id.* at 226–35.

[131] *Id.* at 229.  Ammerman netted $909,173.77 from the sale.  *Id.*

[132] *Id.* at 232.

[133] *Id.* at 234.

[134] *Id.* at 233–34.

## G.    Second Quarter 2015 Results

The second quarter of 2015 ended on July 1, 2015, and EPL announced the results of that quarter in an August 13, 2015 press release.[135]  The press release highlighted that "System-wide [SSS] grew 1.3%," noting that Company SSS "in the second quarter decreased 0.5%, driven by a 3.9% decrease in traffic, partially offset by a 3.4% increase in average check."[136]  It also adjusted its 2015 System-wide SSS projection from 3–5% down to "approximately 3.0%" for the year.[137]

The market did not react positively to EPL's second quarter results.  EPL's stock opened at $18.04 per share on August 13, 2015, just before the Company announced its results.[138]  It closed at $14.56 per share the following day.[139]  By the end of 2015, EPL had suffered a 37% decline in its stock price, which opened at $20 per share on January 2, 2015, and closed at $12.63 per share on December 31, 2015.[140]

## H.    Litigation Ensues.

On August 24, 2015, Daniel Turocy, on behalf of a class of EPL stockholders who bought or sold stock between May 15 and August 13, 2015, sued EPL, Sather, Roberts,

---

[135] *See* SLC Report Ex. 272; SLC Report at 240.

[136] SLC Report Ex. 272 at 1.

[137] *Id.* at 2.

[138] SLC Report App. C at C-4.

[139] *Id.*

[140] *Id.* App. C at C-1, C-5; SLC Report at 246.

Valle, Pollo Partners, Trimaran, and Freeman Spigoli in the United States District Court for the Central District of California, alleging violations of federal securities laws in connection with the Block Trade (the "Federal Action").[141]

On November 5, 2015, Armen Galustyan, an EPL stockholder, sued Sather, Roberts, Valle, Bogeajis, Maselli, Kehler, Barton, Roth, Ammerman, Borgese, and Pollo Partners in this court alleging breach of fiduciary duty and unjust enrichment in connection with the Block Trade (the "Galustyan Action").[142] On July 13, 2016, the parties to the Galustyan Action stipulated to a stay of that suit pending the outcome of the Federal Action.[143] On October 2, 2020, Galustyan voluntarily dismissed his suit with prejudice pursuant to Court of Chancery Rules 23.1 and 41(a)(1)(ii), which the court granted on October 7, 2020.[144]

Kevin Diep (the "Plaintiff"), an EPL stockholder, filed the complaint in this action on September 20, 2016 (the "Complaint"), after obtaining documents through a Section 220 action in this court.[145] The Complaint names Sather, Roberts, Valle, Bogeajis,

---

[141] SLC Report at 44; *see also id.* at viii (identifying the defendants in the Federal Action as the "*Turocy* Defendants"); *Daniel Turocy v. El Pollo Loco Hldgs., Inc.*, No. 8:15-cv-01343 (C.D. Cal.) ("Federal Action").

[142] *See* SLC Report Ex. 290; C.A. No. 11676-VCL ("Galustyan Action"), Dkt. 1; *see also* SLC Report at vi (identifying the defendants in the Galustyan Action as the "*Galustyan* Defendants").

[143] Galustyan Action, Dkt. 15.

[144] *See id.* Dkts. 23–24.

[145] *See* Dkt. 1 ("Compl.") ¶ 11.

26

Ammerman, Borgese, and Pollo Partners as defendants (the "Defendants").[146] It asserts two counts: Count I for breach of fiduciary duty in connection with the Block Trade, asserted against all of the Defendants except Roberts; and Count II for breach of fiduciary duty in connection with the public disclosures made prior to the Block Trade in the Earnings Call, asserted against Sather, Roberts, and Valle.[147]

Defendants moved to stay this suit in favor of the Federal Action, to dismiss this suit pursuant to Court of Chancery Rule 12(b)(6) for failure to state a claim on which relief can be granted, and to dismiss this suit pursuant to Court of Chancery Rule 23.1 for failure to make demand or show that demand would have been futile.[148] The court stayed Count II—the disclosure claim—in favor of the Federal Action but denied all three motions as to Count I—the insider trading claim.[149]

## I.     The Company Forms the SLC.

On October 6, 2017, the Company formed a Special Litigation Committee (the "SLC") to investigate and evaluate the allegations and issues raised in this suit, the Federal Action, and the Galustyan Action.[150] The Company further tasked the SLC with

---

[146] *See id.*

[147] *Id.* ¶¶ 119–34.

[148] *See* Dkt. 32 at 87:20–88:2 (The Court).

[149] *See id.* at 88:3–9 (The Court).

[150] SLC Report at 18.

investigating and evaluating the allegations and requests for action contained in demands submitted by two other EPL stockholders.[151]

The Company appointed three of its newer directors to the SLC: Douglas Babb, William Floyd, and Carol Lynton.[152]

### 1.  Douglas Babb

Babb, who holds a J.D. from the University of South Carolina School of Law, is licensed to practice law in Texas, South Carolina, and Minnesota, and has served in various executive capacities throughout his career.[153] He joined the EPL board on January 3, 2018, and joined the SLC on January 11, 2018.[154]

Prior to joining the board, Babb knew only one other director, William Floyd, who also sits on the SLC.[155] Floyd recruited Babb to EPL's board to fill EPL's need for "another independent board member."[156] Also prior to joining the board, Babb "conducted a preliminary review of all of EPL's then-pending litigations" but "was not asked to, and did not, reach any conclusions regarding the claims alleged prior to joining the SLC."[157]

---

[151] *Id.*

[152] *Id.* at 19.

[153] *Id.* at 20–21.

[154] *Id.* at 19.

[155] *Id.* at 21.

[156] *Id.*

[157] *Id.*

### 2. William Floyd

Floyd, who holds an MBA from the Wharton School of Business at the University of Pennsylvania, has served on a variety of corporate and non-profit boards and in executive capacities at several companies in the food and beverage industry, including Taco Bell, PepsiCo, and Kentucky Fried Chicken.[158] He joined the EPL board on April 1, 2016, and joined the SLC on October 6, 2017.[159]

Prior to joining the board, Floyd knew only one other director, Kehler.[160] Kehler recruited Floyd to EPL's board "because the Company was seeking independent board members to meet federal and agency requirements for public companies."[161] In the process, Floyd and Kehler "briefly discussed the litigations at issue" but Floyd "was not asked to, and did not, reach any conclusions regarding the claims alleged prior to joining the SLC."[162]

---

[158] *Id.* at 22.

[159] *Id.*

[160] SLC Report at 23; *see* Brown Decl. Ex. A ("Floyd Dep. Tr.") at 235:5–250:3.

[161] SLC Report at 23; *see* Floyd Dep. Tr. at 14:14–16.

[162] SLC Report at 23; *see* Floyd Dep. Tr. at 10:11–14:13.

Floyd met Kehler through their service on the Board of Overseers of the University of Pennsylvania School of Nursing.[163] It meets three to four times per year and has thirty members. Kehler served as its Chair during part of Floyd's tenure on the Board.[164]

In the spring of 2016, while Kehler chaired the Board of Overseers and before Floyd joined the EPL board, Floyd received a "Dean's Medal" in recognition of his service to the Board of Overseers.[165] Despite the similarity in the name of the award and Kehler's first name, the award refers to the "Dean" of the school, not to Dean Kehler.[166]

During his time as an executive at Taco Bell over twenty years ago, Floyd "overlapped" with Sather and Bogeajis, who also worked in executive capacities there.[167] Despite this overlap, they "were acquaintances but did not work together or have a personal relationship" and "had very limited contact with each other while at Taco Bell."[168]

### 3. Carol Lynton

Lynton, who holds an MBA from the Harvard Business School, has worked in the financial and restaurant industries and has served in executive capacities in both the private

---

[163] SLC Report at 24; Floyd Dep. Tr. at 235:5–13.

[164] SLC Report at 24; Floyd Dep. Tr. at 236:12–17.

[165] Floyd Dep. Tr. at 238:13–239:8.

[166] *Id.* at 241:17–21 (testifying that the Dean's medal refers to "the dean of the school," and "not Dean Kehler"); Dkt. 181 ("Oral Arg. Tr.") at 13:20–14:8 (SLC's Counsel).

[167] SLC Report at 24.

[168] *Id.*; Floyd Dep. Tr. at 245:20–247:5.

and non-profit sectors.[169]  She joined the EPL board on April 1, 2016, and joined the SLC on October 6, 2017.[170]

Prior to joining the board, Lynton knew only one other director, Kehler.[171]  Kehler recruited Lynton to EPL's board "because the Company was seeking independent board members to meet federal and agency requirements for public companies."[172]  In the process, Lynton and Kehler "briefly discussed the litigations at issue" but Lynton "was not asked to, and did not, reach any conclusions regarding the claims alleged prior to joining the SLC."[173]

Kehler's wife and Lynton attended Harvard College at the same time, where they met approximately two to three times.[174]  Lynton, Kehler, and Kehler's wife all simultaneously worked for Lehman Brothers during a two-year period from 1983 to 1985: Lynton and Mrs. Kehler as junior analysts, and Kehler as a senior associate and Vice President.[175]  During that time, Lynton "worked on a pitch with Mr. Kehler" once, and only

---

[169] SLC Report at 24–25.

[170] *Id.* at 24; Brown Decl. Ex. B ("Lynton Dep. Tr.") at 69:12–73:25.

[171] *See* SLC Report at 25; Lynton Dep. Tr. at 28:3–29:16, 97:11–14.

[172] SLC Report at 25; Lynton Dep. Tr. at 96:7–21.

[173] SLC Report at 25; Lynton Dep. Tr. at 115:25–116:23.

[174] SLC Report at 26; Lynton Dep. Tr. at 117:14–118:11.

[175] SLC Report at 26; Lynton Dep. Tr. at 112:9–24, 118:12–120:14.

for "a single two-week period."[176]  Her other interactions with Kehler during that time resulted from a year-long deal Lynton worked on with Kehler's officemate.[177]

Since their time at Lehman Brothers, Lynton "sought business advice from Mr. Kehler on a single occasion, roughly 10 years ago, regarding fees for a private equity firm looking to invest in her business."[178]  Lynton asked two other people for similar advice.[179]

Lynton's eldest daughter attended the same high school as the Kehlers' eldest son, though they only overlapped for "maybe a year or two."[180]  In the past 35 years, Lynton has dined with the Kehlers approximately 20 times.[181]  Though at one time Lynton and the Kehlers' children would visit each other's homes—and even Lynton's mother's home once when the kids were young—Lynton has dined with Kehler's wife only twice since Lynton's April 2016 appointment to the EPL board.[182]  As Lynton describes it, her socializing with the Kehlers revolved around their children, all of whom are now adults.[183]

---

[176] SLC Report at 26; Lynton Dep. Tr. at 119:4–25.

[177] SLC Report at 26.

[178] *Id.*

[179] *Id.*

[180] Lynton Dep. Tr. at 123:4–16.

[181] SLC Report at 26; Lynton Dep. Tr. at 127:13–128:4.

[182] Lynton Dep. Tr. at 138:17–20, 172:2–25, 174:6–23.

[183] *See id.* at 137:9–23 (testifying that many dinners with the Kehlers "would have been a long time ago because the kids would be grown up, 10, 15 years ago"); *id.* at 168:8–12 ("Q. So when you had these dinners with the Kehlers over the years, just generally, what did

Lynton sits on the board of the East Harlem Tutorial Program, for which she has raised over $5 million and to which she has personally contributed over $2 million.[184] Kehler has contributed approximately $13,000 to the East Harlem Tutorial Program over the past ten years.[185] Kehler sat on the board of CARE USA, a non-profit to which Lynton had donated approximately $10,000 in the five years before joining the EPL board.[186]

## J.  The SLC Investigation and Report

On January 17, 2018, the court stayed this suit pending the results of the SLC's investigation.[187]

The SLC reviewed over 249,000 documents obtained from counsel to this suit and the Federal Action, including board materials, financial updates and reports, documents detailing internal Company governance and policies, and documents and emails generated in connection with the Board Presentation, the Management Presentation, and the Block Trade.[188]  The SLC further reviewed fourteen deposition transcripts from the Federal

---

you talk about?  A.  It was mostly with the kids and about the kids."); *id.* at 171:22–172:25 (testifying as to only one "dinner with all the kids as adult children," noting that the dinners had "been kids, mostly at residences").

[184] SLC Report at 26; Lynton Dep. Tr. at 271:11–272:20.

[185] SLC Report at 26; *see also* Lynton Dep. Tr. at 271:17–272:8 (estimating that the Kehlers have contributed "around $12,000" to the East Harlem Tutorial Program).

[186] SLC Report at 26; Lynton Dep. Tr. at 274:1–21.

[187] Dkt. 57.

[188] *See* SLC Report at 49–52.

Action and conducted additional interviews of twelve witnesses comprising all potential defendants and "several key EPL employees," like Hawley and Austin.[189]

The SLC met with Plaintiff's counsel and counsel representing each of the various defendants in this suit and the Federal Action.[190] It met formally as a committee sixteen times between December 2017 and February 2019, and "routinely met" with its counsel, Gibson Dunn & Crutcher LLP, throughout the course of its investigation.[191] It concluded its investigation and published its report on February 13, 2019.[192]

The SLC's 377-page report attached 408 exhibits and contained nearly 2500 footnotes. The report concluded "that the Company should move to dismiss" this suit and should "not pursue litigation nor otherwise take any further action against any of the Defendants."[193] It reached this conclusion in light of the litigation costs to the Company, the "risk that litigation would distract management from its primary task of operating EPL's business, serving EPL's customers, and delivering profits and value for EPL's stockholders," and the risk that litigation would "inevitably focus a portion of the

---

[189] *Id.* at 63–67.

[190] *Id.* at 52–63.

[191] *Id.* at 67; *see id.* at vi (identifying Gibson Dunn as the SLC's counsel).

[192] *See* SLC Report.

[193] *Id.* at 377.

Company's public relations and management efforts on what the SLC has determined are meritless claims."[194]

As to Count I of the Complaint, the SLC concluded that "neither element of a *Brophy* claim" for fiduciary insider trading was met.[195] Specifically, the SLC determined that none of the information contained in Hawley's projections was material, nonpublic information.[196] The SLC then further concluded that, even if Hawley's projections were material, no defendant was motivated to trade by the projections. The SLC observed that the Block Trade occurred on the first day of the first Trading Window after the IPO, timing that suggests that the sale was made at the first opportunity for reasons unrelated to Hawley's projections. The SLC further found that Defendants' contemporaneous reactions to Hawley's projections did not suggest that they were motivated to trade by the information.[197]

---

[194] *Id.* at 374–76.

[195] *Id.* at 313. To prevail on a *Brophy* claim, "[t]he plaintiff must show that '1) the corporate fiduciary possessed material, nonpublic company information; and 2) the corporate fiduciary used that information improperly by making trades because she was motivated, in whole or in part, by the substance of that information." *Kahn v. Kohlberg Kravis Roberts & Co.*, 23 A.3d 831, 838 (Del. 2011) (quoting *In re Oracle Corp.*, 867 A.2d 904 (Del. Ch. 2004), *aff'd* 872 A.2d 960 (Del. 2005) (ORDER)).

[196] SLC Report at 313–14.

[197] *See id.* at 314–42 (evaluating the motivations for each individual who sold EPL stock during the relevant period and concluding that none were motivated by any nonpublic Company information). To establish scienter under *Brophy*, a plaintiff must show that a "corporate fiduciary used material, nonpublic information improperly by making trades, at least in part, *because* of the substance of that information." *Silverberg v. Gold*, 2013 WL 6859282, at *14 (Del. Ch. Dec. 31, 2013) (emphasis added). In other words, the trade must

35

As to Count II of the Complaint, the SLC concluded that neither Sather, Roberts, nor Valle breached their fiduciary duties of care, candor, or loyalty in connection with their disclosures in the Earnings Call.[198] Specifically, the SLC determined that "the Executive Management Team was well informed, acted in good faith, and was not grossly negligent in its decision not to disclose potentially unreliable value score data and highly variable intra-quarter SSS projections," that none of their statements in the Earnings Call were materially misleading misstatements or omissions, and that "the Company does not have a viable claim for breach of the duty of loyalty against any of the Defendants" due to a "lack of evidence of bad faith, intent to violate the law, failure to implement internal controls, or a conscious disregard of their corporate oversight duties."[199]

The SLC filed its report and moved to dismiss this suit on February 13, 2019.[200] The parties completed briefing the SLC's motion to dismiss almost two years later, on January 21, 2021, and the court heard oral argument on April 23, 2021.[201]

---

have at least partially resulted from a fiduciary's conscious exploitation of "the fact that they possessed material, nonpublic information." *Id.* (citing *Guttman v. Huang*, 823 A.2d 492, 505 (Del. Ch. 2003)).

[198] *See* SLC Report at 342–56.

[199] *Id.*

[200] Dkt. 62. Count I is the only count against Pollo Partners in the Complaint and the only cause of action that would survive if the settlement is approved. *See infra* Section I.K.

[201] *See* Dkt. 163; Dkt 168 ("Pl.'s Answering Br."); Dkt. 171; Oral Arg. Tr.

## K.    The Settlements

In January 2019, the parties to the Federal Action reached an agreement in principle to settle that suit.[202]  The United States District Court for the Central District of California approved that settlement on August 27, 2019.[203]  The SLC evaluated the settlement and concluded that "the [Federal Action] Defendants decided to settle the litigation not because they believed the allegations had merit, but because of the risks inherent in potentially proceeding to trial and the significant costs that would be incurred in doing so."[204]

On April 22, 2021, the day before oral argument on the SLC's motion to dismiss, the parties filed a Stipulation and Agreement of Compromise and Settlement (the "Stipulation of Settlement") as to the individual defendants.[205]  Specifically, Bogeajis, Roberts, Sather, Valle, Ammerman, and Borgese agreed to collectively pay $625,000 in exchange for Plaintiff's agreement to release them of the claims asserted in this action.[206]  Pollo Partners is not a party to the Stipulation of Settlement.

---

[202] *See* SLC Report at 46; SLC Report Ex. 397.

[203] *See* Federal Action, Dkts. 218–19.

[204] SLC Report at 47 n.319.  The terms of the settlement are not mentioned in the SLC Report.  Plaintiff notes in briefing, and Defendants do not dispute, that the Federal Action settled for a cash payment of $20 million.  *See* Pl.'s Answering Br. at 18–19.

[205] *See* Dkt. 176.

[206] *Id.* ¶ N.

37

## II.    LEGAL ANALYSIS

In light of the individual defendants' Stipulation of Settlement, this analysis resolves the SLC's motion to dismiss the claims asserted against Pollo Partners only.

Under *Zapata*, this court evaluates a special litigation committee's motion to dismiss under a "procedural standard akin to a summary judgment inquiry."[207]  "[T]he movant has the burden of demonstrating the absence of any material issue of fact, and any doubt as to the existence of such an issue will be resolved against him."[208]

*Zapata* calls for a two-step analysis.  As the first step, the court must "review[] the independence of SLC members and consider[] whether the SLC conducted a good faith investigation of reasonable scope that yielded reasonable bases supporting its conclusions."[209]  As the second step, the court applies "its own business judgment to the facts to determine whether the corporation's best interests would be served by dismissing the suit."[210]

### A.    First Step

"The first prong of the *Zapata* standard analyzes the independence and good faith of committee members, the quality of [the SLC's] investigation and the reasonableness of

---

[207] *In re Oracle Corp. Derivative Litig.*, 824 A.2d 917, 928 (Del. Ch. 2003).

[208] *Lewis v. Fuqua*, 502 A.2d 962, 966 (Del. Ch. 1985).

[209] *London v. Tyrrell*, 2010 WL 877528, at *11 (Del. Ch. Mar. 11, 2010).

[210] *Id.*

its conclusions."[211] For the purposes of a motion subject to *Zapata*, the SLC is not entitled to any favorable presumptions.[212] Rather, the SLC bears "the burden of proving independence, good faith and a reasonable investigation."[213]

### 1. The SLC Members Are Independent.

The first matter to be considered at the initial step is whether the SLC was independent.[214] The SLC "bear[s] the burden of proving that there is no material question of fact about their independence" because "the situation is typically one in which the board as a whole is incapable of impartially considering the merits of the suit."[215] Still, "the substantive contours of the independence doctrine" remain unchanged from the pre-suit demand context.[216] "At bottom, the question of independence turns on whether a director is, *for any substantial reason*, incapable of making a decision with only the best interests

---

[211] *In re WeWork Litig.*, 250 A.3d 976, 997 (Del. Ch. 2020) (quoting *Kahn*, 23 A.3d at 836)).

[212] *Kaplan v. Wyatt*, 484 A.2d 501, 507 (Del. Ch. 1984), *aff'd* 499 A.2d 1184 (Del. 1985).

[213] *Zapata*, 430 A.2d at 788–89.

[214] *See Lewis*, 502 A.2d at 936 (finding that a single-member special litigation committee did not meet its burden where that member's "past and present associations raise a question of fact as to his independence").

[215] *London*, 2010 WL 877528, at *13.

[216] *Id.* ("[I]t is conceivable that a court might find a director to be independent in the pre-suit demand context but not independent in the *Zapata* context . . . . [I]t is primarily a function of the shift in the burden of proof from the plaintiff to the corporation when the suit moves from the pre-suit demand zone to the *Zapata* zone.").

of the corporation in mind," and the analysis therefore focuses on "impartiality and objectivity."[217]

"To establish independence, the court must be persuaded that the SLC can base its decision on the merits of the issue rather than being governed by extraneous consideration or influences."[218] The analysis is thus contextually "tailored"—because the court may presume that "special litigation committee members are persons of typical professional sensibilities," the key inquiry is whether "an unacceptable risk of bias" is present.[219]

None of the three SLC members sat on EPL's board at the time of the Block Trade, and none have any financial interest in the transactions at issue.[220] Thus, the court's analysis focuses on whether "the relationships [the SLC members] have with defendants are of such a nature that they might have caused [the SLC] to consider factors other than the best interests of the corporation in making their decision to move for dismissal."[221]

Plaintiff does not challenge Babb's independence, and Babb did not have relationships with any of the Defendants prior to joining the EPL board. The court thus

---

[217] *In re Oracle*, 824 A.2d at 938 (quoting *Parfi Hldg. AB v. Mirror Image Internet, Inc.*, 794 A.2d 1211, 1232 (Del. Ch. 2001) *rev'd in part on other grounds*, 817 A.2d 149 (Del. 2002) (emphasis added)).

[218] *Sutherland v. Sutherland*, 958 A.2d 235, 239 (Del. Ch. 2008) (internal quotation marks omitted).

[219] *In re Oracle Corp.*, 824 A.2d at 941–42, 947.

[220] *See* SLC Report at 28–29, 31.

[221] *London*, 2010 WL 877528, at *13 ("Such a relationship would raise a material question as to the SLC's independence.").

finds that the SLC has met its burden to establish Babb's independence and ability to consider the allegations impartially and in the best interests of the Company.

Plaintiff challenges the independence of Floyd and Lynton, arguing first that each lacks independence because they prejudged Plaintiff's claims by filing a motion to dismiss this action in 2016, and next that each lacked independence from Kehler.[222]

In support of the first argument, Plaintiff relies on *London v. Tyrell*, but that case is distinguishable.[223] There, the court concluded that

> if evidence suggests that the SLC members prejudged the merits of the suit based on . . . prior exposure or familiarity, and then conducted the investigation with the object of putting together a report that demonstrates the suit has no merit, this will create a material question of fact as to the SLC's independence.[224]

The "prior exposure" and "familiarity" present in *London* is markedly different from the ostensible acts of "prejudgment" in this case. There, both members of a two-member SLC also sat on an audit committee that reviewed valuations tied to the alleged wrongdoing.[225] They later characterized their consideration of the valuations as an "attack" on the flaws in

---

[222] *See* Pl.'s Answering Br. at 50–58.

[223] *Id.* at 50–52.

[224] *London*, 2010 WL 877528, at *15.

[225] *Id.*

41

those valuations, using language "suggesting that the SLC might have engaged in a combative assault rather than an investigation."[226]

In this case, Plaintiff's only argument concerning Floyd and Lynton's involvement with the motion to dismiss derives from Floyd's deposition testimony, when he stated that no one on the Board objected to the filing.[227] From this, Plaintiff effectively seeks an inference that both Floyd and Lynton must therefore have reviewed, analyzed, and prejudged the merits of this litigation. Plaintiff, however, cannot rely on inferences at this stage. The applicable standard is "akin to a summary judgment inquiry,"[228] where "unsupported allegations are insufficient to create a genuine dispute as to material facts."[229]

---

[226] *Id.* at *16.

[227] *See* Floyd Dep. Tr. at 66:8–16.

[228] *In re Oracle*, 824 A.2d at 928; *see also Kaplan*, 484 A.2d at 507 (noting that this motion "is to be handled procedurally in a manner akin to proceedings on summary judgment" in that "[e]ach side . . . shall have an opportunity to make a record" and that the moving party "has the normal burden imposed on a moving party under a Rule 56 motion").

[229] *Shuttleworth v. Abramo*, 1997 WL 349131, at *1 (Del. Ch. June 13, 1997) ("Although all facts are to be viewed in favor of the non-moving party on a motion for summary judgment, unsupported allegations are insufficient to create a genuine dispute as to material facts."); *see also* Ct. Ch. R. 56(e) ("When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial."); *In re Transkaryotic Therapies, Inc.*, 954 A.2d 346, 356 (Del. Ch. 2008) (holding that "once the moving party has satisfied its initial burden of demonstrating the absence of a material factual dispute, the burden shifts to the nonmovant to present some specific, admissible evidence that there is a genuine issue of fact for a trial" and that the nonmovant "may not rest upon the mere allegations or denials of its pleading" (cleaned up)).

Stripped of the inference, Plaintiff's argument is that the mere fact that Floyd and Lynton sat on the board when the motion was filed, standing alone, automatically disqualifies them. That argument finds no support in Delaware law. Moreover, the tone of the SLC Report and of each SLC member is even-keeled and unbiased, suggestive of a fair investigation—not a "combative attack" on Plaintiff's claims. The prior motion to dismiss, therefore, does not create a material question of fact as to Floyd's or Lynton's independence.

Plaintiff next argues that Floyd and Lynton lack independence from Pollo Partners based on their respective relationships with Kehler. This decision assumes for the sake of analysis that connecting Floyd and Lynton to non-party Kehler would suffice to demonstrate that Floyd and Lynton lacked independence from Defendant Pollo Partners. Even so, the SLC has met its burden to demonstrate their independence.

As to Floyd, Plaintiff primarily relies on the fact that he served on the Board of Overseers for the University of Pennsylvania Nursing School with Kehler for sixteen years. When Kehler chaired the Board of Overseers, Floyd received the "Dean's Medal" from the school.[230] This relationship, however, does not create a material question of fact as to Floyd's independence. The Board of Overseers has "30 board members" and "meets three to four times per year," so co-service on that board is plainly not enough to impugn Floyd's

---

[230] Pl.'s Answering Br. at 57.

43

independence.[231]  Kehler was not the Dean of the school, nor is there any evidence to suggest that he was involved in the decision to select Floyd for the award.[232]  Again, Plaintiff cannot rely on mere inference on this motion and has failed to build a record that gives rise to a genuine dispute of facts as to Floyd's independence.  Nothing about Floyd's and Kehler's overlapping service on the Board of Overseers impairs Floyd's ability to consider the allegations impartially and in the best interests of the Company.

Plaintiff also contends that Kehler's statements to Floyd while recruiting Floyd to EPL's board call Floyd's independence into question.  For this point, Plaintiff relies on the following passage from Floyd's deposition:

> As I recall, Dean [Kehler] really said three things [about this litigation].  He said we did nothing illegal, we did nothing unethical, but he said the optics did not look good with the, you know, with the trading of the stock.[233]

There is no basis to conclude that Kehler's conclusory statements to Floyd would have caused Floyd to prejudge the merits of the litigation.  In light of the extensive additional testimony provided by Floyd, his recollection of Kehler's statements in early 2016 are

---

[231] *See* SLC Report at 24.

[232] *See* Floyd Dep. Tr. at 250:10–251:15 (confirming that the Dean's Medal was "in no way, shape or form" connected to Dean Kehler").

[233] *Id.* at 10:21–11:1.

immaterial and insufficient to suggest that Floyd approached the investigation with his mind already made.[234]

Neither Floyd's service on the Board of Overseers with Kehler, nor Floyd's receipt of the Dean's medal, nor Kehler's statements in early 2016 regarding the litigation, suffice to establish a genuine dispute of material fact as to Floyd's independence. The SLC has therefore met its burden of establishing Floyd's independence and ability to consider the allegations impartially and in the best interests of the Company.

The question of Lynton's independence from Kehler presents a closer call, but the SLC has likewise met its burden of establishing her independence. Lynton's relationship with Kehler was more substantial than Floyd's. Lynton attended the same college as Kehler's wife, where the two met a handful of times. Lynton then worked at the same company as both Kehler and his wife for a two-year period after college. Over the past

---

[234] *See, e.g.*, *id.* at 10:14–18 ("We discussed the litigation but . . . very briefly. I mean, the focus of our discussion was about what I could add to the board and the company and . . . Dean had brought it up very briefly."); *id.* at 14:4–16 (testifying that he understood the SLC's purpose being "to investigate, analyze the allegations and determine what steps would go from there including making a recommendation" and that he was selected for the SLC because he "was an independent director"); *id.* at 46:16–47:8 ("And every one of us approached it in a very independent, impartial way with no preconceived notions whatsoever about [whether] they were guilty or they were innocent. We looked at this in a very exhaustive way. . . . I think we maintained a very objective, impartial view throughout the whole process."); *id.* at 50:16–51:1 ("[W]e went into this . . . with our mission here to evaluate independently and partially [sic] and let the facts, let the data take us where they would. So I don't think it's -- there was no fait accompli about sending a report to the Delaware Chancery Court with a motion to dismiss."); *id.* at 65:16–22 (testifying that he recalled the EPL board moving to dismiss this suit in 2016, "but I don't recall any of the details of it").

45

thirty-five years, Lynton has dined with the Kehlers approximately twenty times, with most of those meals concentrated around the time when their "now grown up" children "were little."[235] Lynton once asked Kehler a question regarding private equity fees over ten years ago, a question that she also asked two other individuals. Both Kehler and Lynton have made donations over the past ten years to charities where the other served as a board member, but the specific donations identified by Plaintiff were immaterial compared to their wealth.[236]

To meet its burden, the SLC must establish that Lynton's relationship with the Kehlers would not have biased Lynton in her investigation of the claims against Pollo Partners. Two decisions of this court discussing whether similar relationships impugn the independence of SLC members are instructive.

In *Sutherland v. Sutherland*, the plaintiff challenged the independence of a one-member special litigation committee.[237] The plaintiff argued that the committee's sole member had undisclosed and material financial ties to a defendant director in addition to a

---

[235] Lynton Dep. Tr. at 134:14–136:5.

[236] *Compare* SLC Report at 26 (noting that Lynton has donated over $2 million to the East Harlem Tutorial Program), *and* Lynton Dep. Tr. at 181:4–10, 287:6–10 (testifying that her charitable foundation controls assets worth $8 million and that her net worth is approximately $40 million), *with* SLC Report at 26 (noting that Kehler donated $13,000 to the East Harlem Tutorial Program).

[237] 958 A.2d at 236.

disclosed social relationship.[238] Specifically, the plaintiff pointed to the committee member's compensation as a director, his firm's compensation for work related to the investigation, and accounting work he had performed for the director defendant's wife over ten years prior.[239] The court found the disclosed social relationship immaterial and held that the alleged financial ties were "de minimus" and did not "raise a material question as to [the committee member's] independence."[240] The court concluded that the director acted with sufficient independence where the director "hired independent counsel to support him in his investigation" and was "himself, a named partner in a reputable Arkansas accounting firm," giving him "a strong incentive to act independently" despite any "de minimis" social contact with an interested director.[241]

By contrast, in *London v. Tyrell*, the court found a material question of fact as to one SLC member's independence based on a familial relationship.[242] There, an SLC member was married to a defendant director's cousin, and although the relationship did "not seem to be particularly close," the court could not "say with certainty that [the SLC

---

[238] *Id.* at 240–41.

[239] *Id.*

[240] *Id.*

[241] *Id.* at 241. This holding is buttressed by the fact that Delaware law applies greater scrutiny to the independence of one-member special litigation committees. *See id.* at 239–40 ("It should be noted that one-member SLCs are less insulated from the influence of interested directors, and are closely scrutinized.").

[242] 2010 WL 877528, at *15–16.

member] would not have considered the potentially awkward situation of showing up to [the defendant's] annual party after the family rumor mill had spread the word that [the SLC member] had recommended that a lawsuit should proceed against the host."[243] Because the extent to which the family association "may have influenced" the objectivity of the committee member presented a dispute of fact, the court found that the special litigation committee had not met its burden under *Zapata*.[244]

Lynton's relationship with the Kehlers is more like the relationship described in *Sutherland* than the familial or financial obligations present in *London*. Lynton holds numerous leadership roles in the restaurant and non-profit sectors separate from her participation on the EPL board and the SLC—like the committee member in *Sutherland*, Lynton has a reputational incentive to act independently.[245] And unlike the committee member in *London*, the connections between Lynton and the Kehlers—based largely around their children—are unlikely to result in the type of awkward post-investigation encounters that would weigh on a director's decision-making during the course of the

---

[243] *Id.* at \*14.

[244] *Id.* The *London* court further evaluated a prior business relationship between the second special litigation committee member and the defendant director. The defendant had previously served as CFO of the committee member's company and "made a significant and valued contribution to the efforts to sell" that company for a good price. *Id.* at \*15. The court found "a strong possibility" that this committee member would feel "a sense of obligation" to the defendant for his assistance in the sale, which sufficed to establish "a material question of fact regarding the SLC's independence." *Id.*

[245] *See* Lynton Dep. Tr. at 69:18–73:18.

SLC's investigation. There is no basis to conclude that a relationship based mainly around their children gave rise to a "sense of obligation" to Kehler, much less Pollo Partners. Moreover, the Kehlers' contributions to charities affiliated with Lynton would not compromise her independence given the relatively small size of those contributions.[246]

In sum, neither Lynton's professional nor personal connections to Kehler suffice to establish a genuine dispute of material fact as to her independence. The SLC has therefore met its burden of establishing Lynton's independence and ability to consider the allegations impartially and in the best interests of the Company.

## 2. The SLC Conducted a Reasonable Investigation.

In addition to establishing its own independence, the SLC bears the burden "to prove also that it conducted a reasonable investigation of the matters alleged in the complaint in good faith."[247] The court denies an SLC's motion to dismiss where it arises from a "selective investigation" that fails to adequately address all of the plaintiff's claims.[248]

A reasonable SLC investigation should "thoroughly investigate[] the factual elements underlying" the plaintiff's claims and should result in "an in depth inquiry and . . . [a] well documented report."[249] It should also "investigate all theories of recovery asserted

---

[246] *See, e.g., id.* at 181:4–10, 287:6–10 (testifying that her charitable foundation controls assets worth $8 million and that her net worth is approximately $40 million).

[247] *Kaplan*, 484 A.2d at 507.

[248] *Sutherland*, 958 A.2d at 244 (quoting *Electra Inv. Tr., PLC v. Crews*, 1999 WL 135239, at *6 (Del. Ch. Feb. 24, 1999)).

[249] *Kahn*, 23 A.3d at 842.

in the plaintiffs' complaint" and "explore all relevant facts and sources of information that bear on the central allegations in the complaint."[250]  Further, "[t]o demonstrate that its recommendations are supported by reasonable bases, the SLC must show that it correctly understood the law relevant to the case."[251]

Plaintiff argues that the SLC investigation was unreasonable in scope because it did not thoroughly evaluate the impact of the settlements or of Pollo Partners' violation of the Policy.[252]  Plaintiff also argues that the SLC lacked reasonable bases for the conclusions in its report because it applied an incorrect standard of materiality,[253] erroneously dismissed Hawley's conclusions as to the materiality of the Company's declining value scores and SSS,[254] and erroneously concluded that Pollo Partners lacked the scienter necessary to establish a claim for insider trading.[255]

### a. Scope of Investigation

Plaintiff identifies two factors that the SLC purportedly failed to consider in reaching its conclusions:  first, the $20 million value of the Federal Action settlement and the $625,000 value of the individual defendants' settlement in this suit; second, whether

---

[250] *London*, 2010 WL 877528, at *17.

[251] *Id.*

[252] Pl.'s Answering Br. at 21–25.

[253] *Id.* at 38.

[254] *Id.* at 26–42.

[255] *Id.* at 42–48.

Pollo Partners' violation of the Policy provides any independent causes of action against Pollo Partners or aids in establishing Pollo Partners' scienter.

"If the SLC fails to investigate facts or sources of information that cut at the heart of plaintiffs' complaint this will usually give rise to a material question about the reasonableness and good faith of the SLC's investigation."[256] Where the SLC decides "not to explore specific acts of alleged misconduct," it must "carefully analyze whether a summary investigation of those specific acts could shed light on the more serious allegations," because a "total failure to explore the less serious allegations in plaintiffs' complaint may cast doubt on the reasonableness and good faith of an SLC's investigation."[257]

Plaintiff's assertion that the SLC failed to consider settlement of the Federal Action is incorrect. The SLC Report notes that:

> In reaching the conclusions discussed herein, the SLC considered what impact, if any, the fact that the *Turocy* Defendants decided to settle the *Turocy* Class Action, and the settlement amount, should have on the SLC's analysis. The SLC determined that neither the fact, nor amount, of the settlement alters the SLC's determinations. The SLC concludes that the *Turocy* Defendants decided to settle the litigation not because they believed the allegations had merit, but because of the risks inherent in potentially proceeding to trial and the significant costs that would be incurred in doing so. The SLC notes that the MOU explicitly states that the

---

[256] *London,* 2010 WL 877528, at *17 (citing *Sutherland*, 958 A.2d at 242).
[257] *Id.*

51

> *Turocy* Defendants have not, by entering into the agreement, admitted any liability or wrongdoing.[258]

The gravamen of Plaintiff's argument is that the SLC's dismissal of the settlement was conclusory. But, as is common in litigation settlements, the settlement does not constitute an admission of liability. Rather, non-legal business decisions, like those cited in the SLC Report's conclusion, may incentivize a party to settle litigation.[259]

The individual defendants in this action reached a settlement agreement with Plaintiff for $625,000 on June 23, 2020, over one year after the SLC concluded its investigation and published its report.[260] The settlement agreement did not exist at the time of the SLC's investigation and thus could not have been included in the SLC Report. This court has not yet evaluated or approved the settlement. Plaintiff argues that the SLC should have later reconsidered its position in light of the settlement agreement,[261] but Plaintiff's arguments do not demonstrate a genuine dispute of fact material to the scope of SLC's investigation.

As this court highlighted in *London v. Tyrell*, the court's inquiry into the scope of an SLC's investigation is designed to ensure that the SLC "seriously investigated" Plaintiff's allegations, including "fundamental theor[ies] of recovery in plaintiffs'

---

[258] SLC Report at 47 n.319.

[259] *See id.* at 374–76.

[260] *See* Dkt. 176 ¶ N.

[261] Pl.'s Answering Br. at 22–23.

complaint."[262]  The SLC did just that, and Plaintiff offers no explanation for why the settlement agreement itself would alter the factual findings and legal conclusions that the SLC reached after its investigation.

Plaintiff next argues that the SLC should have considered whether Pollo Partners' violation of the Policy could have "established a presumption that [Pollo Partners] acted with scienter, or a presumption that [Pollo Partners] possessed material information," whether "violation of the policy should result in all inferences being drawn against [Pollo Partners] as to the elements of scienter and materiality," and whether the "violation of the Insider Trading Policy gave rise to any independent legal claims" against Pollo Partners.[263]

As noted above, the SLC must "investigate all theories of recovery asserted *in the plaintiffs' complaint*."[264]  The court will not fault the SLC for failing to evaluate claims that were not asserted in the Complaint.

Plaintiff's argument that the SLC failed to consider the elements of scienter and materiality in light of the Policy similarly fails to impugn the reasonableness of the scope of the SLC's investigation.  The SLC considered the technical violation,[265] concluding that "the potential harm in this instance was mitigated by the fact that Ms. Austin was aware of

---

[262] *London*, 2010 WL 877528, at *22.

[263] Pl.'s Answering Br. at 24–25.

[264] *London*, 2010 WL 877528, at *17 (emphasis added).

[265] *See* SLC Report at 208–09.

the Block Trade in advance and did not find it objectionable."[266]  In any event, the SLC conducted an independent and thorough evaluation of the materiality of Hawley's information and of each Defendants' scienter based on its interviews and review of an extensive record, obviating the need for an inference of intent based on the Policy alone.

In sum, the SLC's investigation and report considered each allegation contained in the Complaint and evaluated the facts and law relevant to those allegations.  It further considered the Federal Action settlement and the Policy and did not find that either weighed heavily on its analysis.  The SLC has therefore met its burden of establishing that its investigation was reasonable in scope.

### b. Bases for Conclusion

Plaintiff contests the reasonableness of the SLC's conclusions on three grounds: first, that the SLC applied an incorrect standard of materiality;[267] second, that the SLC erroneously concluded that Hawley's value score and SSS data were immaterial;[268] and third, that the SLC erroneously concluded that the Defendants lacked scienter.[269]

It bears noting at the outset that the court's role on this motion is not to second guess the conclusions that the SLC reached.[270]  Rather, the court must only determine whether

---

[266] *Id.* at 280–82.

[267] Pl.'s Answering Br. at 38.

[268] *Id.* at 26–42.

[269] *Id.* at 42–48.

[270] *See Kaplan*, 484 A.2d at 519 (holding that "it is the conduct and activity of the Special Litigation Committee in making its evaluation of the factual allegations and contentions

54

the SLC had "reasonable bases" for reaching its conclusions and whether it reached those conclusions in good faith.[271] In this case, the SLC did.

The standard for materiality under Delaware law is information that "would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."[272] In arguing that the SLC incorrectly applied a subjective, rather than an objective, standard for materiality, Plaintiff points to two sentences in the SLC Report[273] and to an excerpt from Lynton's deposition in which she defines material as information that "has significant effect on the operations of the company" or "has an effect on the long-term operations and viability of the company."[274]

The SLC, however, identified and applied the correct standard.[275] It evaluated the information provided by Hawley, identified various reasons why Hawley's data did not

---

contained in the plaintiff's complaint which provide the measure for the Committee's independence, good faith and investigatory thoroughness" because "it is the Special Litigation Committee which is under examination at this first-step stage of the proceedings, and not the merits of the plaintiff's cause of action").

[271] *See London*, 2010 WL 877528, at *11.

[272] *Gantler v. Stephens*, 965 A.2d 695, 710 (Del. 2009).

[273] Pl.'s Answering Br. at 38; *see also* SLC Report at 286 ("*In the SLC's view*, the Company's performance and projections fall within the expected level of intra-quarter variability that companies typically experience. . . ." (emphasis added)); *id.* at 287 ("*The SLC also found significant* the fact that, in the past, EPL has rebounded in the final period of a quarter after suffering two very poor, and significantly below-plan, periods of Company SSS." (emphasis added)).

[274] Lynton Dep. Tr. at 51:10–52:12.

[275] *See* SLC Report at 249 (quoting *In re Oracle*, 867 A.2d at 934); *id.* at 251 (quoting *Gantler*, 955 A.2d at 710).

support the conclusion that price increases *caused* the decline in SSS and Company value scores, and concluded that "the Company's intra-quarter information, when viewed with the Company's disclosures and cautionary statements about the inability to guarantee a particular level of performance, would, if disclosed, not have impacted the total mix of information."[276] It is contextually evident that the language cited by Plaintiff does not refer to the SLC's view on materiality, but rather to the SLC's views on the accuracy of Hawley's information—one of many factors in the materiality analysis. And despite Lynton's personal definition of materiality differing from the legal standard, there is no evidence sufficient to establish a dispute of fact as to whether the SLC adopted Lynton's standard in its analysis.[277]

Plaintiff next argues that the SLC incorrectly discounted Hawley's data when reaching its conclusions. But the SLC relied on Hawley's own statements discounting a correlation between value scores and pricing increases and noting that he "had been, in effect, providing his own point of view throughout his portion of the [Management Presentation]."[278] Further, as detailed above, the recipients of Hawley's data all understood

---

[276] *Id.* at 367.

[277] *See* Lynton Dep. Tr. at 292:18–293:3 (testifying that she "[r]elied on the definition [of materiality] in the SLC report").

[278] SLC Report at 154; *see also id.* at 151 ("Mr. Hawley testified that he did not believe that the data indicated that 'value scores' declined simultaneous to EPL's pricing actions.").

that his SSS projections did not "'translate' into his more formal quarterly forecasts"[279] and that Hawley himself had "ultimately dismissed" the conclusion that "the slower sales were due to changing underlying sales trends."[280]

The SLC's investigation and report is not rendered unreasonable merely because Plaintiff disagrees with its conclusions. The SLC did not discount Hawley's data; it simply concluded that the EPL board and Executive Management Team correctly reached less-nefarious conclusions from that data. The challenges raised by Plaintiff regarding the materiality of Hawley's data offers an alternative conclusion: that the decline in SSS and value score was based on pricing increases. This does not create a dispute of fact as to whether the conclusion the SLC reached was reasonable. Because the SLC had provided ample reasonable bases for its conclusion that the data presented by Hawley was immaterial, Plaintiff's challenge fails.

Plaintiff lastly argues that because Defendants "[a]ffirmatively [c]oncealed" certain information during the Earnings Call, the SLC should have concluded that Defendants acted with scienter when participating in the Block Trade.[281] Plaintiff points to information regarding the Company's declining SSS numbers and value scores in the time leading up to the Earnings Call. Because Defendants were made aware of this information at the

---

[279] *Id.* at 161.

[280] *Id.* at 185.

[281] Pl.'s Answering Br. at 42–47.

May 11 and 12 board meetings, Plaintiff contends that their decision not to share it publicly in the earnings call evinces their intent to trade on that information.

No Pollo Partners representatives participated in the Earnings Call where information was purportedly "affirmatively concealed." In any event, the SLC concluded that the EPL board and Executive Management Team made the decision not to share that information in the Earnings Call for other reasons. Specifically, the SLC found that "the SSS range in the Q1 2015 Earnings Call Q&A may have been Mr. Hawley's forecast," but it "did not reflect an official position by the Company."[282] Hawley confirmed this position, noting that his data serves as an "estimate for Mr. Roberts and others so that they could, in their judgment, make disclosures that they considered appropriate."[283]

The SLC also noted that the existence of the lock-up agreements and the Policy resulted in May 19, 2015, being the first available Trading Window since the IPO. The SLC concluded that the open Trading Window provided a more plausible explanation for Pollo Partners' intent than the exploitation of material nonpublic information.[284]

Plaintiff relies on *Silverberg v. Gold* to support the premise that "[Pollo Partners'] sale on the very first day of the trading window supports the finding of scienter."[285] In

---

[282] SLC Report at 188.

[283] *Id.* at 189.

[284] *See id.* at 333.

[285] Pl.'s Answering Br. at 48 (citing *Silverberg v. Gold*, 2013 WL 6859282, at *14 (Del. Ch. Dec. 31, 2013)).

*Silverberg*, the defendants' "large-scale disposal of stock immediately following the FDA's approval" of their drug was "sufficient to support a reasonable inference" for "purposes of a motion to dismiss" where the plaintiff alleged that the defendants knew of "a significant risk of the physician community being reluctant to prescribe [the drug] because of the cost and reimbursement concerns associated with it."[286] Because the defendants knew the risk that their drug would not be commercially successful, did not disclose that risk, and sold their stock immediately after the event that would have revealed the drug's failure, the court found scienter reasonably inferable.[287]

*Silverberg* is distinguishable from this case, both substantively and procedurally. Substantively, the SLC concluded that the timing of the trade on the first available Trading Window since the IPO *undercuts* a finding of scienter rather than supporting that finding. This conclusion was based, reasonably, upon the nature of Pollo Partners' investment and the lack of available selling opportunities prior to the Trading Window. Procedurally, Plaintiff is not entitled to the same inference the plaintiff in *Silverberg* received. Rather, Plaintiff had the opportunity to develop a record that would cast doubt on the SLC's conclusions regarding scienter but failed to do so.

None of Plaintiff's arguments raise a genuine question of material fact as to the reasonableness of the scope of the SLC's investigation or the presence of reasonable bases

---

[286] 2013 WL 6859282, at *14.

[287] *See id.* at *15.

for the SLC's conclusions. Rather, the SLC has met its burden and established that its conclusions were the product of a reasonable, good faith investigation.

## B. Second Step

This court has framed the analysis called for in the second step as follows:

> [T]he trial court's task in the second step is to determine whether the SLC's recommended result falls within a range of reasonable outcomes that a disinterested and independent decision maker for the corporation, not acting under any compulsion and with the benefit of the information then available, could reasonably accept.[288]

Having already dilated extensively on Plaintiff's challenge to the substance and scope of the SLC's investigation, it is not much of a leap to conclude that the recommended result falls within the range of reasonable outcomes. At bottom, a disinterested and independent decision-maker for the Company, not acting under any compulsion and with the benefit of the information available to the SLC, could reasonably accept the SLC's recommendation to dismiss Plaintiff's claims.

---

[288] *In re Primedia, Inc. S'holders Litig.*, 67 A.3d 455, 468 (Del. Ch. 2013); *accord Obeid v. Hogan*, 2016 WL 3356851, at *12 n.14 (Del. Ch. June 10, 2016) (collecting cases). The second step of the *Zapata* analysis has been described by Delaware courts as "the essential key," on the one hand, *Zapata*, 430 A.2d at 789, and "discretionary" on the other. *Kaplan*, 484 A.2d at 520; *accord WeWork*, 250 A.3d at 1013 (noting that the second step "*permits* the court in its *discretion* to use its own independent business judgment in determining whether the motion to dismiss should be granted" (emphasis added) (internal quotation marks omitted)); *Sutherland*, 658 A.2d at 239 (noting that "the court *may* nonetheless exercise its own business judgment and deny the motion to dismiss" (emphasis added)). Given the salutary and "innovative" nature of the second step, this jurist is inclined to view it as essential. *See Obeid*, 2016 WL 3356851, at *12.

Only the *Brophy* claim of Count I is asserted against the non-settling defendant, Pollo Partners. That claim requires a showing of scienter.[289] The SLC directly addressed the facts on which Plaintiff relies to support a finding of scienter and concluded that they offered little support. Although this decision is focused on Pollo Partners, the SLC evaluated the information available to each Defendant, as well as each of the Defendants' respective reasons for participating in the Block Trade, and determined that innocent explanations for the timing of the trade and the disclosures issued in May 2015 were more plausible than the insider trading theory set forth in the Complaint.[290] Specific to Pollo Partners, the SLC found no liquidity concerns present and that the private equity model for Pollo Partners' investment provided a more credible explanation for the timing of the sale than did any information to which insiders may have had access.[291]

Faced with factual circumstances that present compelling explanations for the timing of the Block Trade, the SLC's determination that Count I is not worth pursuing was a reasonable one. In other words, the SLC reasonably concluded that pursuit of the weak *Brophy* claim against Pollo Partners is not worth the expense of protracted and uncertain litigation.

---

[289] *See supra* note 195.

[290] *See* SLC Report at 313–42.

[291] *See id.* at 333–34.

61

## III. CONCLUSION

The SLC has met its burden of proof.  The SLC's motion to dismiss is GRANTED.